The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Gene Brian AALBU, Defendant-Appellant.

No. 83SA141.

Supreme Court of Colorado, En Banc.

March 11, 1985.
Rehearing Denied April 1, 1985.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H.

Forman, Sol. Gen., Clement P. Engle, Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, Colorado State Public Defender, Linda J. Hotes, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Gene Brian Aalbu, appeals his conviction of criminal solicitation to commit first degree murder. The issues which he raises include the claimed unconstitutionality of the criminal solicitation statute, § 18-2-301, 8 C.R.S. (1978), the failure of the trial court to sever charges and to suppress evidence, several evidentiary rulings made during the trial, the failure of the trial court to instruct the jury on the affirmative defense of renunciation and certain lesser included offenses, and the asserted insufficiency of the evidence to support the conviction. Finding no error, we affirm.[1]

## I.

The defendant was charged in the District Court of El Paso County with solicitation to commit first degree murder, § 18-2-301, 8 C.R.S. (1978), allegedly committed between April 20 and May 30, 1980, in El Paso County, Colorado.[2] The charge was filed on June 17, 1980, and was based primarily on a series of conversations which the defendant had with James Ross concerning a plan to kill Mark Olson. These conversations took place while the defendant was confined in the El Paso County jail on a sentence imposed as a condition of probation on a recent drug conviction. James Ross was also confined in the El Paso County jail during part of this same period of time. On September 26, 1980, the information was amended by adding a count of tampering with a witness. § 18-8-605, 8 C.R.S. (1978). This charge was based on the defendant's alleged attempt to induce Olson to testify falsely at a providency hearing conducted in the District Court of El Paso County on January 21, 1980, at which Olson pled guilty to conspiracy to dispense a narcotic drug.

Prior to trial the defendant filed several motions including the following: a motion to dismiss the criminal solicitation charge on the ground that the statutory proscription of section 18-2-301 was unconstitutionally vague and overbroad in violation of due process of law; a motion to sever the charge of criminal solicitation from the charge of tampering with a witness; a motion to suppress taped telephone conversations between the defendant and James Ross; and a motion to authorize the admission of the results of a polygraph examination which the defendant had recently taken. The court denied all the defendant's motions except that concerning the polygraph evidence, upon which it deferred ruling until trial.

A summary of the evidence at trial will place in focus many of the issues raised by the defendant. The prosecution's evidence established that the defendant, along with Mark Olson and Richard McAllister, was charged in 1979 in the District Court of El Paso County with possession, sale, and conspiracy to possess and sell a narcotic drug, cocaine. These charges arose out of several drug transactions in August and October 1979, including a sale of cocaine by the defendant and Olson to an undercover police officer on October 13, 1979, at Olson's home.[3] On January 21, 1980, Olson pled

---

**1.** This appeal was originally filed in the court of appeals, but was transferred to this court pursuant to sections 13-4-102(1)(b) and 13-4-110, 6 C.R.S. (1973), because of the defendant's constitutional challenge to the criminal solicitation statute.

**2.** Criminal solicitation to commit first degree murder is subject to the same penalty as that provided for criminal attempt to commit first degree murder, §§ 18-2-301(5), 8 C.R.S. (1978); 18-2-101(4), 8 C.R.S. (1978), namely, a pre-

sumptive sentence of eight to twelve years plus one year of parole, § 18-1-105(1)(a)(I), 8 C.R.S. (1984 Supp.).

**3.** The charges against the defendant related to the transaction on October 13, 1979, while those against Olson arose out of incidents on August 1, August 21, and October 13, 1979. The charges against McAllister were based on the August 21, 1979, incident in which Olson also was involved.

guilty to conspiracy to dispense a narcotic drug in exchange for dismissal of the other counts. The defendant, according to Olson, attempted to induce him to testify at the providency hearing that he (the defendant) was not involved in the drug transaction, but was merely handling the money obtained from the sale as a favor to Olson. Olson refused to accede to this request and instead told the judge that the defendant had supplied the cocaine and received most of the money obtained from the sale. Immediately after the providency hearing the defendant confronted Olson outside the courtroom and told him that he (Olson) "had really screwed him." On February 26, 1980, the defendant pled guilty to conspiracy to possess narcotic drugs in exchange for the dismissal of the charges of selling and possessing a narcotic drug. The court sentenced the defendant to five years probation on the condition that he serve seventy-five days in the county jail and make restitution in the amount of $1400, which represented one-half of $2800 in unrecovered government funds which he and his confederates had allegedly received from other cocaine sales to undercover police agents. Prior to admitting any evidence relating to the October 1979 drug transaction involving the defendant and Olson, the trial court instructed the jurors in this case that they were to consider such evidence for the limited purposes of showing a motive to commit criminal solicitation and of establishing that, with respect to the charge of tampering with a witness, there was an official proceeding pending against both the defendant and Olson.

Evidence presented by the prosecution also established that while the defendant was confined in the El Paso County jail on the seventy-five day sentence, he met James Ross, an inmate ward representative, who was assigned to the same part of the jail as the defendant. At first, according to Ross, he and the defendant engaged only in general conversation, but later the defendant told him that there were some people whom he wanted killed. The defendant initially mentioned as targets some members of the police department who had been involved in the cocaine investigation and also Mark Olson and Richard McAllister. In later conversations, however, the defendant focused exclusively on Olson as an intended victim. Ross testified that he agreed to kill Olson in exchange for a gun, a pickup truck, and some money from the defendant.

Ross, who had served as a police informant on prior occasions, reported these conversations to a police detective and agreed to participate in further conversations with the defendant in exchange for money payments and favorable consideration on criminal matters pending against himself. He was initially fitted with a body transmitter, but this device proved unsatisfactory because background noise within the county jail made conversations between himself and the defendant inaudible. During these unrecorded conversations, according to Ross, it was agreed that the defendant would arrange for his girlfriend to deliver a truck, $200 cash, and a gun to a certain location in Colorado Springs so that Ross could then proceed to carry out his part of the agreement. Ross identified a map allegedly drawn by the defendant which showed the location of Olson's house.[4] After the defendant drew the map on a piece of paper, Ross wrote on the other side of the paper a physical description of Olson given to him by the defendant and the words "strong arm or kill." The map, with the added notations of Ross, was admitted into evidence during Ross' testimony.

Shortly after these initial unrecorded conversations, the police arranged for Ross' release from jail. Pursuant to police suggestion, Ross would call the jail and leave a message for the defendant to call him back at a specific number. When the defendant would call Ross back, the conversation would then be tape recorded. These telephone conversations between the

---

**4.** The investigating detective testified that the actual location of Mark Olson's house was two blocks away from the location shown on the map allegedly drawn by the defendant.

defendant and Ross took place over the period from April 30 to May 27, 1980. On April 30 Ross told the defendant that he had waited at the specified location but that the defendant's girlfriend had not appeared with the truck, gun, and money. The defendant responded that his girlfriend was unable to get the truck from his parents' home, as they were out of town. The next day, after the defendant's girlfriend again failed to appear, Ross asked the defendant whether he was still serious about the plan. The defendant replied, "Damn right." During this conversation the defendant gave Ross his girlfriend's phone number so that Ross could make arrangements for the meeting directly with her. Ross later telephoned the defendant's girlfriend, but she was reluctant to do anything until she spoke to the defendant. Ross again telephoned the defendant, informing him of the conversation with the girlfriend and suggesting that he (Ross) use his own car rather than the defendant's truck. The defendant agreed to this suggestion. Ross told the defendant that he wanted "to get it over with," to which the defendant replied, "Yeah, I do too." During this conversation the defendant also inquired of Ross whether he had a home phone where he could be contacted.

In a later conversation the defendant, believing that his attorney would be successful in obtaining his early release from jail, told Ross that there was "no sense wasting money" on the plan since he (the defendant) would be getting out of jail shortly. When the early release did not occur, however, the defendant said to Ross, "I wouldn't really mind you nailing this guy," although he was not sure "if it will do me any good or not." Because it later developed that the defendant's girlfriend would have no involvement with the plan, the defendant told Ross that he would contact a friend, Mark Hill, about getting Ross what he needed to carry out the plan. The defendant gave Ross Hill's telephone number and urged Ross to contact Hill at work. The defendant cautioned Ross to "[d]o things neatly, whatever you do."

On May 29, 1980, the police ended the investigation because they became concerned that the defendant might have enlisted help from others over whom the police had no control. Ross' testimony was supplemented by that of the detective working with him. This detective, without objection by the defendant, testified that during the course of the investigation he believed Ross was providing accurate information about the defendant's plan to retaliate against Mark Olson.

The defendant's case centered around his asserted interest in locating Richard McAllister. The defendant presented testimony, through an attorney that represented him in the drug case, that the defendant's primary concern was to locate McAllister in order to obtain a discharge of the defendant's $1400 restitution obligation and a reduction of his jail sentence. The defendant testified to the same effect and, in addition, denied having any motive to seek revenge against Mark Olson. There was evidence that the defendant, while serving his seventy-five day sentence, obtained a three day release from jail in order to find McAllister.[5] Although the defendant was unable

5. The attorney who represented the defendant on the 1979 drug charges testified that prior to the drug transaction of October 13, 1979, which resulted in the arrest of the defendant and Olson, Olson and McAllister had sold cocaine to undercover police officers on other occasions and that $2800 of the money used by the police to make these other purchases had not been recovered. In ordering the defendant to pay $1400 in restitution, the court, according to the testimony of the defendant's lawyer in the drug case, mistakenly believed that the defendant and McAllister were one and the same person and thus imposed the $1400 restitution on the defendant. When the defendant received the 75 day sentence and was ordered to pay restitution, McAllister had not yet been arrested and was still at large. Upon being later informed by the defendant's attorney that it was McAllister who participated with Olson in the prior drug sales to the police, the sentencing judge, pursuant to the consent of the district attorney, allowed the defendant a three day release so that he could attempt to locate McAllister and to ultimately establish that it was McAllister, not the defendant, who received the money from these prior sales.

to locate McAllister, he learned that Olson probably had McAllister's address.

The defendant also testified that, with respect to his telephone conversations with Ross, he had decided "to just agree with him" since Ross was in a position to harm the defendant's girlfriend. The discussions of the gun and truck, according to the defendant, stemmed from Ross' interest in purchasing them. The defendant denied drawing a map showing the location of Olson's house, although he admitted that he gave Ross verbal directions to the house.

Outside the presence of the jury, the defendant renewed his pretrial request to admit into evidence the results of his polygraph examination. Although the record indicates that in May, 1980, shortly before the case was filed against the defendant, the investigating detective arranged for James Ross to take a polygraph examination, the defendant did not seek to offer any evidence with respect to Ross' polygraph. The trial court sustained the prosecutor's objection to the evidence of the defendant's polygraph.

During cross-examination of the defendant, the prosecution inquired about an alleged visit by the defendant to Olson's house after Olson entered his guilty plea to the drug charge and about hostile statements which the defendant purportedly made at that time, including a demand for money owed him by Olson. The defendant denied the incident. When defense counsel later challenged the factual basis for this line of questioning, the prosecuting attorney informed the court that the questions were based on a letter which Olson wrote to his attorney and which had not been made available to the prosecution until the previous morning. The court ruled that the prosecution had not violated its obligation to promptly notify defense counsel of the existence of the letter and declared a recess in order to permit the defense attorney to examine the letter and to interview both Olson and Olson's attorney. Later, the prosecution called as rebuttal witnesses Olson and Olson's attorney in order to lay a foundation for the admission of the letter. The letter was ultimately admitted into evidence over the defendant's objection, which essentially was one of relevancy, and defense counsel cross-examined Olson about the contents of the letter.

At the close of the evidence, the court once again instructed the jury to consider the evidence of the defendant's participation in the October 1979 cocaine transaction for the limited purposes of showing a motive for the criminal solicitation charge and the defendant's and Olson's involvement in an official proceeding with respect to the witness tampering count. The court also instructed the jury on the affirmative defense of entrapment. The court did not give, nor did the defendant request, jury instructions on the affirmative defense of renunciation or on any lesser included offenses to the crime of criminal solicitation. The jury returned a not guilty verdict on the crime of tampering with a witness and a guilty verdict to the crime of criminal solicitation to commit first degree murder. The defendant was sentenced to a term of ten years, and this appeal followed.

The claims raised by the defendant consist of the following: the criminal solicitation statute, § 18–2–301, 8 C.R.S. (1978), is unconstitutionally vague and overbroad in violation of due process of law; the trial court erred in refusing to sever the solicitation charge from the charge of tampering with a witness; the admission into evidence of the defendant's conversations with Ross violated the defendant's privilege against self-incrimination, the right to effective assistance of counsel, and due process of law, U.S.Const. amends. V, VI, and XIV; Colo. Const. art. II, secs. 16, 18 and 25; the trial court erred in admitting into evidence the letter from Mark Olson to his attorney because the prosecution failed to timely disclose the document to the defendant; the court should have permitted the defendant to offer evidence that a police detective had arranged for the prosecution's principal witness, James Ross, to take a polygraph examination; the trial court erred in failing to instruct the jury on the affirma-

tive defense of renunciation; the trial court erred in failing to instruct the jury and to submit for its consideration the lesser included offenses of criminal solicitation to commit first degree assault and second degree assault; and the evidence presented at trial was insufficient to sustain the defendant's conviction for criminal solicitation to commit the crime of first degree murder.

## II.

We consider first the defendant's constitutional challenge to the statutory definition of criminal solicitation in section 18–2–301(1), 8 C.R.S. (1978), which states:

Except as to bona fide acts of persons authorized by law to investigate and detect the commission of offenses by others, a person is guilty of criminal solicitation if he commands, induces, entreats, or otherwise attempts to persuade another person to commit a felony, whether as principal or accomplice, with intent to promote or facilitate the commission of that crime, and under circumstances strongly corroborative of that intent.

The defendant makes a two-pronged attack on the statute. He first argues that the statute is unconstitutionally vague because of the legislative failure to define the phrase "circumstances strongly corroborative of that intent" and because of the absence of any requirement that such circumstances occur close in time to the requisite act of commanding, inducing, entreating, or otherwise attempting to persuade another to commit a felony. He next argues that these same infirmities in the statutory proscription render the statute unconstitutionally overbroad. We are unpersuaded by these arguments.

## A.

■ In *People v. Latsis*, 195 Colo. 411, 578 P.2d 1055 (1978), we reversed the trial court's dismissal of a criminal solicitation charge on the asserted basis of unconstitutional vagueness and concluded that the modifying phrase "under circumstances strongly corroborative of that intent" suffi-

ciently satisfied due process standards of clarity. We there stated:

In our view, the modifying phrase relates to the burden upon the prosecution to present a quantum of evidence sufficient to demonstrate that the accused acted with the specific intent to promote or facilitate the commission of a crime. In other words, it is not sufficient to show merely that the accused solicited the commission of a crime; rather, sufficient circumstances surrounding the overt act of solicitation must be presented which corroborate that the act in fact was done with the requisite specific intent. This language of the statute is of benefit to an accused and protects those whose actions may have been innocently motivated or done in jest. It is, of course, for the jury to determine whether the circumstances shown by the prosecution were "strongly corroborative" of the alleged intent.

195 Colo. at 414, 578 P.2d at 1058. We know of no reason to depart from our holding in *Latsis* and reaffirm it at this time.

■ We find no merit in the defendant's argument that the statute is constitutionally deficient in failing to expressly require a close temporal proximity between the "strongly corroborative" circumstances and the particular act of solicitation. The critical focus in a vagueness challenge is whether the law "either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). As we have often stated, due process of law does not require "mathematical exactitude in legislative draftsmanship." *E.g., People ex rel. City of Arvada v. Nissen*, 650 P.2d 547, 550 (Colo.1982). "[W]hile a statute must be sufficiently specific to give fair warning of the proscribed conduct, it often must remain sufficiently general 'to address the essential problem under varied circumstances.' " *People v. Alexander*, 663 P.2d 1024, 1027 (Colo.1983), quoting

*Colorado Auto & Truck Wreckers v. Department of Revenue,* 618 P.2d 646, 651 (Colo.1980).

■ As *Latsis* makes clear, a conviction of criminal solicitation must be based on prosecutorial proof beyond the mere verbal act of soliciting another to commit a crime. The prosecution, in addition, is required to present sufficient evidence of the circumstances surrounding the act of solicitation to permit a jury to conclude beyond a reasonable doubt that the solicitation itself was done with the specific intent to promote or facilitate the commission of the crime solicited. This added element of "circumstances strongly corroborative of [specific] intent" serves to protect persons "whose actions may have been innocently motivated or done in jest." *Latsis,* 195 Colo. at 414, 578 P.2d at 1058.

■ The element of corroborative circumstances, in our view, is sufficiently specific to give fair warning of the proscribed conduct but general enough to permit proper application of the statute under varied circumstances. These circumstances may include corroborative activity which does not occur simultaneously with or immediately subsequent to the verbal act of solicitation, as long as the corroborative circumstances are such as to permit a finding beyond a reasonable doubt that the act of solicitation was conjoined with the specific intent to promote or facilitate the commission of the crime solicited. To be sure, the temporal proximity between the corroborative circumstances and the act of solicitation can well be a significant evidentiary factor in the factfinder's assessment of whether guilt has been proven beyond a reasonable doubt. The absence of an express requirement of temporal proximity, however, does not render the statutory definition of criminal solicitation void for vagueness.

### B.

■ We are similarly unpersuaded by the defendant's overbreadth challenge. "The overbreadth doctrine prevents the state from regulating conduct by encroach-ing on basic constitutional rights, such as speech and assembly, which may be within the sweep of the statutory prohibition." *People v. Andrews,* 632 P.2d 1012, 1016 (Colo.1981); *see Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *People v. Mason,* 642 P.2d 8 (Colo. 1982). As we expressly recognized in *Latsis,* there is no constitutionally protected right of expression in soliciting another to commit a crime. 195 Colo. at 415, 578 P.2d at 1058. The statutory proscription of criminal solicitation, therefore, poses no threat to the lawful exercise of free speech or other basic constitutional rights.

### III.

We next address the defendant's claim that the trial court, by failing to sever the charge of criminal solicitation from that of tampering with a witness, erroneously allowed the jury to consider highly prejudicial information concerning the October 1979 drug transaction that resulted in the arrest and prosecution of both the defendant and Mark Olson. We find no reversible error in the trial court's denial of the defendant's motion to sever.

■ Crim.P. 8(a) authorizes the joinder of offenses based on a series of acts arising from the same criminal episode. Our past decisions have approved the joinder of offenses closely related in time and place, *People v. Walker,* 189 Colo. 545, 542 P.2d 1283 (1975), the joinder of offenses committed at different times but in the same place and under similar circumstances, *People v. Pickett,* 194 Colo. 178, 571 P.2d 1078 (1977), and the joinder of offenses committed at different times and places but constituting part of a schematic whole, *People v. McCrary,* 190 Colo. 538, 549 P.2d 1320 (1976). *See generally Corr v. District Court in and for the Eighth Judicial District,* 661 P.2d 668, 673–74 (Colo.1983). When two or more offenses are joined in a single prosecution, the defendant may move for a severance of counts. Crim.P.

14, in this respect, authorizes the court, when it appears that the defendant is prejudiced by the joinder, to order separate trials of counts or provide whatever relief justice requires.

A defendant seeking appellate review of the trial court's denial of a motion for severance must renew the severance motion during the trial or be deemed to have waived any objection to the joint trial. *People v. Peterson,* 656 P.2d 1301 (Colo. 1983); *People v. Barker,* 180 Colo. 28, 501 P.2d 1041 (1972). The purpose of the renewal motion is to alert the court to the necessity of reconsidering its original decision in light of the evidence presented at trial and to permit the defendant to reevaluate the issue of prejudice and "to elect to proceed with a consolidated trial despite the risk of prejudice." *ABA Standards for Criminal Justice, Joinder and Severance,* Commentary to Standard 13–3.3(c) (1978).

In this case the defendant did not renew his motion to sever during the trial and thus waived his right to challenge on appeal the trial court's denial of his pretrial motion to sever the charges. Moreover, even in the absence of the defendant's waiver, his claim lacks merit. A motion for severance of counts is generally addressed to the sound discretion of the trial judge, whose decision will be reversed only upon a showing of abuse of discretion. *E.g., Pickett,* 194 Colo. 178, 571 P.2d 1078; *McCrary,* 190 Colo. 538, 549 P.2d 1320; *Walker,* 189 Colo. 545, 542 P.2d 1283. An abuse of discretion will be found where it is demonstrated that the joinder caused actual prejudice to the defendant, not merely a difference in trial strategy arising from the joint trial of separate offenses, and that the trier of fact was not able to separate the facts and legal principles applicable to each offense. *Pickett,* 194 Colo. at 183, 571 P.2d at 1082. The defendant has failed to demonstrate any prejudice in this case. Even had the charge of criminal solicitation been tried separately from the tampering charge, evidence of the defendant's prior ill feeling, mistreatment, or threats toward his intended victim, Mark Olson, would nonetheless have been admissible on the charge of criminal solicitation as probative of the defendant's motive.[6] *E.g., People v. Elkhatib,* 632 P.2d 275 (Colo.1981); *Reliford v. People,* 195 Colo. 549, 579 P.2d 1145 (1978). Furthermore, the jurors' ability to distinguish the facts and legal principles applicable to each offense was amply demonstrated by the return of a guilty verdict on the charge of criminal solicitation and a not guilty verdict on the charge of tampering with a witness. Under these circumstances we are satisfied that the trial court did not abuse its discretion in denying the defendant's motion to sever the charges.[7]

6. The defendant's own explanation of the conversations between himself and Ross was that he was interested in locating McAllister in order to reduce his jail sentence on the cocaine charge and to discharge himself of any restitution obligation. This theory of defense would be meaningless to the jury without some explanation of the cocaine charges involving the defendant, Olson, and McAllister.

7. In connection with his argument on severance, the defendant contends that the charge of tampering with a witness resulted in the giving of an inadequate jury instruction on the limited purpose for which the evidence of the drug charges was admitted and that the limiting instruction placed undue emphasis on the drug aspects of the tampering charge. We have reviewed the instruction given by the trial court during the presentation of evidence on this matter and the written instruction given to the jury at the conclusion of the trial. We are satisfied that the instructions adequately informed the jurors of the limited purposes for which they were to consider this evidence.

The defendant also contends that the trial court's failure to sever the charge of tampering with a witness resulted in the prosecuting attorney's undue emphasis on the drug transaction in his closing argument and in his making inflammatory references to the defendant as a drug dealer during that argument. Although the defendant made no contemporaneous objection to these remarks, he did raise the matter in his motion for a new trial. The prosecutor's remarks did exceed the bounds of proper argument and should not have been made. They were not so prejudicial, however, when viewed in the context of the entire record, as to require a new trial.

We are satisfied that the above assertions of error, raised in the defendant's brief in connection with the issue of severance, did not affect

## IV.

The defendant contends that the trial court erred in denying his motion to suppress the conversations between himself and James Ross because, in the defendant's view, the admission of this evidence violated his privilege against self-incrimination, U.S. Const. amends. V and XIV; Colo. Const. art. II, sec. 18; his right to the effective assistance of counsel, U.S. Const. amends. VI and XIV; Colo. Const. art. II, sec. 16; and his right to due process of law, U.S. Const. amend. XIV; Colo. Const. art. II, sec. 25. We reject the defendant's claims.

### A.

■■■ The privilege against self-incrimination protects against governmental compulsion to answer questions, not against voluntary conversation. In situations where a person is free to speak or not to speak at all, the privilege is generally not applicable. *Minnesota v. Murphy,* —— U.S. ——, 104 S.Ct. 1136, 1142–43, 79 L.Ed.2d 409 (1984). One exception to this general rule relates to statements obtained from suspects in police custody. Because custodial interrogation is ordinarily conducted by officers who are acutely aware of the potentially incriminating nature of the disclosure sought and because the custodial setting contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," statements obtained during custodial interrogation are constitutionally inadmissible unless the suspect has first been warned of his privilege against self-incrimination and his right to counsel and thereafter voluntarily, knowingly, and intelligently waives these rights. *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). The *Miranda* safeguards, however, do not apply "outside the context of the inherently coercive custodial interrogations" for which

the safeguards were designed. *Murphy,* 104 S.Ct. at 1144, quoting *Roberts v. United States,* 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980).

■■■ Statements freely made by an incarcerated defendant to an ostensible friend, who unknown to the defendant is acting as a police informant, are not the product of any sort of coercion, legal or factual, and for this reason are not made under the inherently coercive circumstances contemplated by *Miranda. See Hoffa v. United States,* 385 U.S. 293, 303–04, 87 S.Ct. 408, 414–15, 17 L.Ed.2d 374 (1966). In this case the defendant's conversations with Ross were freely entered into, as is obvious from the testimony of both Ross and the defendant, as well as from the uncontroverted fact that the defendant returned Ross' phone calls. Thus, the admission of the statements into evidence did not violate the defendant's privilege against self-incrimination.

### B.

■■■ We further conclude that the admission of these statements did not violate the defendant's right to counsel. A person is entitled to the assistance of a lawyer at that point when "judicial proceedings have been initiated against him— 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *see also Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *People v. Pierson,* 670 P.2d 770, 777 (Colo.1983). The conversations challenged by the defendant took place between April 30 and May 27, 1980, long prior to the commencement of the criminal prosecution on June 17, 1980, when the criminal solicitation charge was filed in the District Court of El Paso County. The defendant's confinement in the El Paso County jail prior to the filing of the solicitation charge was directly attributable

the substantial rights of the defendant nor vitiate the trial court's pretrial ruling on the motion

for severance.

to the seventy-five day sentence imposed on the defendant's guilty plea to conspiracy to possess narcotic drugs—a plea that resulted in the dismissal of other drug offenses and terminated the prosecution of those charges. Thus, in contrast to the situation in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), where the defendant's cellmate was a paid government informant and elicited incriminating statements from the defendant while the defendant was in custody and awaiting trial on a charge of armed robbery, no unresolved criminal charges were pending against the defendant during the period of time he engaged in conversations with Ross. Since no prosecution for criminal solicitation and tampering with a witness had yet been initiated against the defendant, there was no right to counsel in connection with these charges that could possibly have been violated by Ross' conduct.

### C.

■ We are also unpersuaded by the defendant's claim that the trial court violated due process of law by admitting evidence of his conversations with Ross without first conducting a hearing to determine the voluntariness of the defendant's statements to Ross. We held in *Hunter v. People*, 655 P.2d 374 (Colo.1982), that when an objection is properly made at trial challenging the voluntariness of a confession, the trial court is obligated to conduct an *in camera* hearing to determine voluntariness, regardless whether the confession was made to a law enforcement officer or to a private individual. *See also Whitman v. People*, 170 Colo. 189, 460 P.2d 767

(1969). The defendant's conversations with Ross in this case, however, were not confessions or statements in the traditional sense of inculpatory admissions concerning prior criminal conduct. Rather, the defendant's statements to Ross constitute the *corpus delicti* of the criminal solicitation— that is, the inducement, entreaty, or attempt to persuade another to commit a felony.

■ Notwithstanding the significance of the defendant's statements to the charge of solicitation, the defendant at no time challenged the voluntariness of these statements before the trial court.[8] Indeed, the defendant's trial testimony, in which he clearly acknowledged that his numerous conversations with Ross were freely undertaken, refutes any possible claim of involuntariness. Where, as here, the defendant never raises before the trial court the issue of voluntariness and, in fact, acknowledges the voluntariness of his statements in his testimony before the jury, the trial court has no reason to believe that the voluntariness of the defendant's statements is being placed in issue and, accordingly, does not violate due process of law by failing to conduct a voluntariness hearing on its own motion.

### V.

The defendant raises the following arguments with respect to evidentiary matters relating to the trial: (1) even though the issue was not raised during the trial, the court nonetheless should have permitted the defendant to offer evidence establishing that a police detective had arranged for

---

**8.** Whether a statement is admissible as voluntarily made, for purposes of due process analysis, depends upon whether it was the product of an essentially free and unconstrained choice by the defendant; in other words, the defendant's will must not have been overborne nor his capacity for self-determination critically impaired. *See, e.g., Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961); *People v. Raffaelli*, 647 P.2d 230, 234 (Colo.1982). This voluntariness determination is, of course, distinct from the question whether the statement is admissible under *Miranda v. Arizona*,

384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *E.g., Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *People v. Raffaelli*, 647 P.2d 230. In the hearing on his motion to suppress, the defendant challenged the admissibility of his statements on the basis of deprivation of his right to counsel and the lack of his prior advisement of *Miranda* rights. However, he made no contention that the statements were involuntarily made, nor did he present any evidence which would support such a claim.

James Ross, the prosecution's principal witness, to submit to a polygraph test; and (2) the court erred in permitting the prosecution to present rebuttal evidence consisting of a letter written by Mark Olson to his attorney, in which Olson described threats made to him by the defendant. We find no reversible error in the trial court's rulings.

### A.

Although the defendant concedes that the results of a polygraph test are inadmissible in a criminal trial, *People v. Anderson*, 637 P.2d 354 (Colo.1981), he nonetheless insists that evidence establishing that the investigating detective arranged for James Ross to take a polygraph test should have been admitted in order to rebut that part of the detective's testimony which clearly indicated that he believed the reports given to him by Ross. The defendant's argument can be resolved with dispatch. In the first place, the defendant never made any objection to the detective's testimony, which the defendant now claims should have been rebutted by the polygraph evidence in question. More important, the defendant never sought to introduce evidence that Ross submitted to a polygraph examination under the detective's direction. Under these circumstances, the defendant's claim amounts to nothing more than an assertion that the trial court should have raised on its own motion the admissibility of evidence never brought to the court's attention. No such obligation existed on the part of the trial court in this case, *see* CRE 103, and the defendant cannot now be heard to raise the issue on appeal. *People v. Atencio*, 193 Colo. 184, 565 P.2d 921 (1977).

### B.

Claiming that the prosecution failed to comply with the timely discovery requirements of Crim.P. 16, the defendant challenges the trial court's admission into evidence, during the prosecution's rebuttal case, of a letter written by Mark Olson to his attorney, in which Olson described threatening conduct directed toward him by the defendant after Olson had entered a plea of guilty to the drug charge in January 1980. An examination of the record satisfies us that the defendant was not prejudiced by any arguable violation of the prosecution's discovery obligations.

The prosecution has a duty to make timely disclosure of "relevant written or recorded statements" of persons whom the prosecution "intends to call as witnesses" at trial and also of "[a]ny written or recorded statements and the substance of any oral statements made by the accused." Crim.P. 16, Part I(a)(1)(I) and (II). The prosecution's disclosure obligations should be performed as soon as practicable following the filing of charges against the accused. Crim.P. 16, Part I(b)(1). The duty of disclosure is a continuing one, as evidenced by Crim.P. 16, Part III(b), which states as follows:

If, subsequent to compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.

A one-day delay in disclosure by the prosecution, especially when occurring during the trial itself, cannot be condoned. *Cf. People v. McKnight*, 626 P.2d 678, 680 (Colo.1981) (trial court improperly admitted statement of an accused, known to district attorney two days prior to trial but not disclosed to defense counsel, but error in admission was harmless). It is quite obvious from the record in this case, however, that defense counsel had adequate opportunity to examine the contents of the letter, to interview Olson and his attorney, and to adequately prepare for cross-examining Olson about its contents during the prosecution's rebuttal case. Assuming, therefore, that the prosecuting attorney violated the discovery obligations of Crim.P. 16 by not notifying the court of the letter as soon as it was received and then making it available to defense counsel, any delay in disclo-

sure was cured by the adequate opportunity provided defense counsel to examine the letter prior to his cross-examination of Olson during the prosecution's rebuttal case.

## VII.

We turn to the defendant's claim that the trial court erred (1) in failing to instruct the jury on the affirmative defense of renunciation in relation to the charge of criminal solicitation and (2) in failing to instruct the jury on the lesser included offenses of criminal solicitation to commit first degree assault and second degree assault. We conclude that no error occurred in the matter of jury instructions in this case.

### A.

Section 18–2–301(4), 8 C.R.S. (1978), creates the following affirmative defense to criminal solicitation: "that the defendant, after soliciting another person to commit a felony, persuaded him not to do so or otherwise prevented the commission of the felony, under circumstances manifesting a complete and voluntary renunciation of the defendant's criminal intent." The defendant failed to tender any instruction on renunciation or to raise in his motion for a new trial any claim regarding the court's failure to instruct on this affirmative defense. Not having raised any claim regarding the applicability of this defense, his argument must be evaluated under the plain error standard of review. Crim.P. 52. The focus of inquiry under the plain error standard is whether the asserted error substantially influenced the verdict or affected the fairness of the trial proceedings. *E.g.*, *Callis v. People*, 692 P.2d 1045 (Colo.1984); *People v. Barker*, 180 Colo. 28, 501 P.2d 1041 (1972).

Section 18–2–301(4) makes plain that the affirmative defense of renunciation is applicable only if the defendant persuades the person solicited not to commit the offense "under circumstances manifesting a complete and voluntary renunciation of the defendant's criminal intent." There was no evidence in this case of complete and voluntary renunciation by the defend-

ant. Although the defendant told Ross at one time that there was "no sense wasting money" on the plan, this statement was made when the defendant believed he would be imminently released from jail and would no longer need the assistance of third parties in his retaliatory plan against Olson. When the early release was not effected, the defendant urged Ross to seek assistance from another friend, rather than from the defendant's girlfriend, in order to proceed against Olson. This undisputed evidence of continued interest by the defendant in seeking retaliation against Olson belies the type of "complete" renunciation contemplated by section 18–2–301(4). Moreover, the defense of renunciation, by definition, can occur only when all the essential elements of a criminal solicitation are present in the first instance. The defendant's theory of defense was not that he had solicited Ross to commit first degree murder, but that he never possessed the requisite intent for criminal solicitation at all. The trial court's failure under these circumstances to instruct *sua sponte* on the affirmative defense of renunciation did not amount to plain error.

### B.

Nor, in our view, did the trial court err in failing to instruct the jury *sua sponte* on the lesser included offenses of criminal solicitation to commit first degree assault and second degree assault. The defendant neither tendered an instruction on any lesser included offense nor did he raise the court's failure to so instruct in his motion for a new trial. Again, the trial court's action must be upheld in the absence of plain error. Crim.P. 52.

The trial court's failure to instruct on lesser included offenses did not amount to plain error under the circumstances of this case. A trial court is not obligated to instruct on a lesser included offense unless such an instruction is requested by the defense or the prosecution. *E.g.*, *People v. Romero*, 694 P.2d 1256 (Colo.1985); *see People v. Paris*, 182 Colo. 148, 511 P.2d 893 (1973). The defendant's

claim in this case was that he was totally innocent of any crime. It may reasonably be assumed that, in the absence of any request for an instruction on a lesser included offense, the defendant "elected to take his chance on an outright acquittal or conviction of the principal charge rather than to provide the jury with an opportunity to convict him of a lesser offense." *Romero*, 694 P.2d at 1269.

## VIII.

We last address the defendant's contention that the evidence was insufficient to support his conviction for criminal solicitation to commit first degree murder. The validity of the defendant's contention turns on whether the evidence, when viewed as a whole and in a light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt. *E.g., People v. Brassfield*, 652 P.2d 588 (Colo.1982); *People v. Franklin*, 645 P.2d 1 (Colo.1982); *People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973). In making this determination we must keep in mind that "it is the jury which should decide the difficult questions of witness credibility and the weight to be given to conflicting items of evidence." *Brassfield*, 652 P.2d at 592. "Only when the testimony of a witness is 'so palpably incredible and so totally unbelievable as to be rejected as a matter of law' can the court properly take this function from a jury." *Franklin*, 645 P.2d at 4, quoting *People v. Rivas*, 197 Colo. 131, 136, 591 P.2d 83, 86 (1979).

We conclude that there was substantial and sufficient evidence to support the jury's guilty verdict in this case. The evidence, when viewed most favorably to the prosecution, established that the defendant approached James Ross about killing Mark Olson. During their initial con-versations the defendant explained to Ross how he could supply him with a truck and a gun and later gave Ross specific directions to Olson's house. In addition, the defendant directed Ross to enlist the assistance of his girlfriend and later another friend in obtaining the truck and the gun for Ross. The defendant's conduct in soliciting Ross was not an isolated incident, but extended over a considerable period of time and involved several telephone conversations which clearly indicated that, as far as the defendant was concerned, the plan to do away with Olson was anything but a prank or a scare tactic. The totality of evidence was sufficient to permit the jury to conclude beyond a reasonable doubt that the defendant induced or entreated James Ross to kill Mark Olson, or at least attempted to persuade Ross to do so, and that the defendant's solicitation of Ross was done with the intent to promote or facilitate the murder of Olson under circumstances strongly corroborative of that intent.[9]

The judgment is affirmed.

---

9. The defendant also asserts that the evidence was insufficient to support the jury verdict because the prosecution did not satisfactorily refute the evidence of entrapment. The jury was instructed on entrapment pursuant to section 18-1-709, 8 C.R.S. (1978), and was further instructed that, once evidence of entrapment had been presented, the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense. *See* § 18-1-407, 8 C.R.S. (1978). Viewing the evidence in a light most favorable to the prosecution, we are satisfied that there was sufficient evidence from which a jury could conclude beyond a reasonable doubt that the defendant was not entrapped.