**UNITED STATES**

v.

**Airman First Class Mark M. OROSTIN, FR 295–80–0935, United States Air Force.**

**ACM 27564.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 3 Dec. 1988.

Decided 20 Feb. 1990.

Appellate Counsel for the Appellant: Mr. George M. Kripner, Mr. Vaughn E. Taylor and Ms. Priscilla M. Lewis–Pierson, Jacksonville, N.C.; Colonel Richard F. O'Hair; Captain Mark R. Land and Captain William E. Boyle.

Appellate Counsel for the U.S.: Colonel Joe R. Lamport, Colonel Robert E. Giovagnoni, Major Terry M. Petrie and Captain Morris D. Davis.

Before BLOMMERS, KASTL and MURDOCK, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

The appellant was convicted of soliciting the contract killing of his wife, in violation of Article 134, UCMJ, 10 U.S.C. § 934. Before us, he argues that the evidence at trial was insufficient to convict. We disagree and affirm.

*The Appellant and "Luciano Angelini"*

In September 1988, the Government inserted an individual using the alias of "Luciano Angelini" into the locale around Holloman Air Force Base, New Mexico. In reality, "Angelini" was an undercover agent of the Air Force Office of Special Investigations, tasked with ferreting out

information regarding use of illegal drugs by military personnel.

"Angelini" met the appellant on several occasions in off-base bars. It was evident from their first two encounters that the appellant was engaging in a great deal of puffery—he boasted of relatives in the drug trade, claimed to be an embezzler, stated that he was an officer, indicated an intention to desert to either Canada or Mexico, offered to obtain classified information, and suggested he might kill the President. "Angelini," posing as a mobster, did not believe these tall tales. The appellant also informed "Angelini" at their second meeting that he was married, his wife was pregnant, and he did not want his wife or child.

At their third encounter, the appellant told "Angelini" that he had discovered a way to acquire $52,000.00 to penetrate the drug trade: If his wife had an accident, he would collect her Servicemen's Group Life Insurance (she, too, was in the Air Force). This time, "Angelini" thought the appellant was serious; he therefore suggested that the appellant need not kill his wife—"Angelini" and his comrades could do the job for hire. "Angelini" indicated that if the appellant was serious, he needed to see $300.00 up-front money. The appellant countered that he could provide $100.00 now and offer a percentage of the life insurance proceeds later.

The parties met a fourth time. The appellant gave "Angelini" two $50.00 bills, and they moved to "Angelini's" rental car to discuss details. The appellant furnished a description of his wife while "Angelini" took notes. The appellant signed an I.O.U. using a name the appellant said was his alias. He also indicated that the killing should look like a rape and be done at a particular time so he would have an alibi. "Angelini" gave the appellant an address where supposedly he could be reached in Chicago for the pay-off.

Later, military authorities persuaded the local Alamogordo, New Mexico civilian police to stage a sham arrest of both "Angelini" and the appellant. They were taken to a civilian jail, where a two hour taped interview with the Alamogordo police took place. Our review of the tape suggests the appellant was in a state of confusion; he did not indicate he was playing a prank.

When interviewed by agents of the Office of Special Investigations, the appellant explained that he knew "Angelini" was a Government undercover agent all the time, and had engaged in a charade, making up wild stories since he likes to "fool with people's heads." As the trial defense counsel put it in his opening statement, the appellant "enjoys matching wits with others" and innocently got caught up in a "game of mystery and intrigue; playing one-on-one, spy versus spy" with an undercover agent.

At trial, the appellant conceded passing the two $50.00 bills to "Angelini." Nevertheless, he insisted, he was waiting for the Government to apprehend him and "Angelini" so that he could spring his trap and reveal that the joke was on them. After all, he maintained, big-time racketeers do not use Government pens, drive compact automobiles, or run with local agents of the Office of Special Investigations. Yet he spotted "Angelini" from the outset, the appellant protested, doing these things.

### Solicitation

In essence, the appellant raises both factual and legal defenses to the charge of solicitation.

■ Factually, as already indicated, he avers that this was a joke that misfired. We believe this to be a factual matter, best resolved by the voting members who saw and observed the participants at trial. *See generally United States v. Gabriel*, 810 F.2d 627, 635–636 (7th Cir.1987); *People v. Aalbu*, 696 P.2d 796 (Colo.1985). Like the voting members, we are satisfied that the evidence of record factually establishes the appellant's guilt of this offense beyond a reasonable doubt. *United States v. Lee*, 22 M.J. 767, 768 (A.F.C.M.R.1986), *pet. denied*, 23 M.J. 406 (C.M.A.1987).

The appellant also mounts a more-technical legal defense to this solicitation charge. He argues that the gravamen of the crime

of soliciting another is a specific invitation, *first voiced by an accused,* that another engage in a crime. *United States v. Gonzales,* 19 M.J. 951, 952 (A.F.C.M.R.1985); *see also United States v. Jones,* 14 M.J. 740, 742 (A.F.C.M.R.1982). In the present case, argues the appellant, any concrete proposal to kill his wife originated with the Government agent; without that agent's initial suggestion, he emphasizes, no crime could have occurred.

We disagree with this analysis.

█ In *Gonzales,* the appellant was charged with soliciting an undercover agent to possess marijuana. This Court's opinion twice stressed that the testimony of the agent was less than clear on whether Gonzales had offered to arrange a purchase of marijuana before or after the agent explicitly asked for his help. However, we emphasized that "that is not crucial to our disposition." *Id.* at 952. Applying the law to the facts at hand in that case, we viewed Gonzales' response as "more of an accommodation than a solicitation" and therefore found the evidence insufficient to sustain the findings. *Ibid.* The short answer to today's appellant is that each situation must be decided factually, and we readily find the facts here distinguishable from those in *Gonzales.* Properly understood, *Gonzales* does *not* establish a rule that innocence or guilt of solicitation turns on who first launches certain words of invitation. *See Meadows v. State,* 190 Ga.App. 662, 380 S.E.2d 326 (1989) (defendant argues informant first suggested the crime); *State v. Kim,* 779 P.2d 512 (Mont. 1989) (dispute over who first suggested prostitution).

We find a useful analogy in the reasoning of the Navy–Marine Court of Military Review in *United States v. Clark,* 28 M.J. 1067, 1069 (N.M.C.M.R.1989). *Clark* illustrates that the heart of the criminal conduct proscribed does not turn on who first nudged the subject down a path from fan-

tasy to reality but, rather, upon the ultimate intention of the parties. In *Clark,* the court compared a solicitation situation to the oft-heard question, "Do you have the time?"

The response "yes" is perhaps technically accurate if the addressee of the question knew the time, but would be disappointing to the questioner *because the thrust of the question is "do you have the time and, if so, please tell me?"*

(Emphasis added).

In the instant situation, the dispute is not over who first proposed preliminary "magic words," such as what the correct time might be—or whether the appellant would be better off with his wife dead. To the contrary, the crux is whether the appellant was actually communicating at some point in their dealings, "I wish my wife dead and I'm endeavoring to get you to do the job for me." As we explained in *Gonzales,* the question to be decided is whether there was an invitation to engage in criminal conduct. 19 M.J. at 952.

What compromises the appellant's logic is his premise that the law of solicitation can be defined for all time by who said what first. To the contrary, one must consider the entire sequence of events.

█ It matters not whether the appellant's suggestion of doing away with his wife was originally merely a malevolent pipe-dream or a serious desire. The fact remains that—after several meetings—the appellant took numerous steps towards asking "Angelini" to make the desire come true.[1] He paid money to "Angelini," supposedly a mobster; made out an I.O.U.; received the address of an alleged gangster headquarters in Chicago; advised "Angelini" about his wife's routine and habits so that she might be murdered; and sought to establish an alibi. He never indicated in this timeframe that his actions were in

---

1. For specific authority that the jury could find a solicitation established on a *later* date when further incidents occurred, *see Frye v. State,* 62 Md.App. 310, 489 A.2d 71 (1985); *State v. Furr,* 292 N.C. 711, 235 S.E.2d 193, 202 (1977), *cert.*

jest.[2]

We are satisfied from the circumstances that there was no legal impediment to the voting members finding the appellant guilty of soliciting the murder of his wife. At some point between the formation of a plan in one's mind and follow-on action, society imposes its protection. *See United States v. Mitchell,* 15 M.J. 214 (C.M.A. 1983); *United States v. Sturdivant,* 9 M.J. 923, 927 (A.C.M.R.1980); *see also Braham v. State,* 571 P.2d 631, 636 (Ak.1977). We are confident that such a factual determination by the voting members in this case had sufficient legal underpinning to be supportable. *See United States v. Morris,* 21 C.M.R. 525 (N.B.R.1956) (evidence unclear as to who first uttered suggestion that prisoners in brig mutiny, but appellant carried it into action); *see generally Huffman v. State,* 222 Va. 823, 284 S.E.2d 837, 839–840 (1981) (good history and citations); Annot., 55 A.L.R.2d 1322, 1331 (1957); *Clark and Marshall's Crimes* (6th ed.1942) 194; *Wharton's Criminal Law* (14th ed.1989 supp.) (extensive gathering of recent cases). We are convinced that the appellant was not merely jesting but indeed had the specific intent to solicit his wife's murder. *See generally United States v. Johnson,* 21 U.S.C.M.A. 279, 45 C.M.R. 53 (1972); *United States v. Wall,* 13 M.J. 964 (A.F.C.M.R.1982).

### Other Assignments of Error

█ The appellant argues that the military judge erred by failing to instruct the members on the allegedly inadmissible evidence of Airman First Class Bredeson. Bredeson testified that the appellant spoke of an intention to "skip the country." Upon a defense objection on the basis of relevance, the military judge sustained the objection. Now, the appellant argues that the judge had a *sua sponte* duty to instruct the members on this matter. The Government advances the thesis that the prosecution was: (a) rebutting the appellant's gen-

eral claim that the whole scheme was a joke that misfired; and (b) showing that the appellant's specific claim to "Angelini" that he was thinking about deserting the Air Force was sincere. We believe Bredeson's testimony showed the appellant's intentions and motives and was properly related to the *res gestae* of the offense. *United States v. Thomas,* 11 M.J. 388, 392 (C.M.A.1981); *United States v. Pitts,* 18 M.J. 522, 524 (A.F.C.M.R.1984); Mil.R.Evid. 105. In any event, we find no *sua sponte* duty to instruct. *See United States v. Dagger,* 23 M.J. 594 (A.F.C.M.R.1986), *pet. denied,* 25 M.J. 241 (C.M.A.1987) (extensive discussion of judge's duty to instruct). We find no error.

We find no merit in the appellant's assertion that his defense counsel were ineffective. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Babbitt,* 26 M.J. 157 (C.M.A.1988).

The remaining assignments of error and invited issues are resolved adversely to the appellant. *See United States v. Williams,* 26 M.J. 606, 608 (A.C.M.R.1988).

█ The appellant argues that his sentence is excessive. We think not. Setting aside for the moment any consideration of the two other offenses of which the appellant was found guilty—solicitation to another to commit adultery and attempted adultery, violations of Articles 134 and 80, UCMJ, 10 U.S.C. § 880—we find the sentence entirely appropriate for an individual who solicited a supposed undercover "hit man" to murder his wife.

Upon our independent review of the record, we note one further matter: The instructions of the military judge on sentencing appear to violate the guidance contained in *United States v. Chaves,* 28 M.J. 691 (A.F.C.M.R.1989) as to the appellant's failure to express remorse. Unlike *Chaves,* however, there was no defense objection. We will assume, *arguendo,* that

*denied,* 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977).

2. See the factors listed in *United States v. Gabriel,* 810 F.2d 627, 635 (7th Cir.1987). *See also*

*United States v. Linnear,* 16 M.J. 628, 629 (A.F.C. M.R.1983), *pet. denied* 17 M.J. 277 (C.M.A.) (evidence insufficient to show a serious request to commit an offense).

the matter was not waived and thus consider the effect of this error upon the sentence. After our review of the record, we are convinced that the sentence is appropriate in relation to the findings of guilty and is not greater than that which would have been imposed if the error had not occurred. *United States v. Sales,* 22 M.J. 305 (C.M.A. 1986).

*Allegations of Post–Trial Mistreatment*

Subsequent to briefs being filed with this Court, the appellant submitted a letter to us on 27 October 1989 concerning alleged mistreatment at the confinement facility at Dyess Air Force Base, Texas. He was held there prior to his transfer to Fort Lewis, Washington. We granted the defense Motion to Submit Document Out of Time. Subsequently, the Government filed with us three affidavits from security policemen who were referenced in the appellant's claim concerning Dyess Air Force Base. The Government's motion to submit those documents is GRANTED.

We have considered in some depth the matters contained therein and have heard the matter of a proper remedy argued orally before us, along with the merits of the case. Civilian appellate defense counsel suggests that we might further investigate this matter by way of a *DuBay*-type hearing. *See United States v. DuBay,* 17 U.S. C.M.A. 147, 37 C.M.R. 411 (1967). We decline to do so. The allegations should be resolved by authorities having original and primary cognizance over conditions of confinement. We reserve for a future day the possibility that an appellant who has exhausted all other available means of relief might be heard before us. *See Unger v. Ziemniak,* 27 M.J. 349 (C.M.A.1989); *Collier v. United States,* 19 U.S.C.M.A. 511, 42 C.M.R. 113 (1970); *Gagnon v. United States,* 42 C.M.R. 1035 (A.F.C.M.R.1970). *See generally* Moyer, *Justice and the Military,* Sec. 2–835ff (1972).

The findings of guilty and the sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Senior Judge BLOMMERS and Judge MURDOCK concur.