NAPOLEAN HOLYFIELD, JR. AND DUANE NARVELL TOWNSELL, APPELLANTS, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 13967

December 20, 1985                                    711 P.2d 834

---

[6]The Honorable Deborah A. Agosti, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CLIFF YOUNG, who recused himself. Nev. Const., art. 6, § 4.

*Samuel T. Bull,* Reno, for Appellants.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, *Edward B. Horn,* Deputy, Washoe County, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

In this consolidated appeal, the central issue is whether police officers may subvert a suspect's constitutional rights under the Fifth Amendment of the federal constitution and article 1 section 8 of the Nevada Constitution by bargaining to have a self-interested, twice-convicted felon and escapee conduct a custodial interrogation that the police could not lawfully conduct themselves. We hold they may not do so. For the reasons discussed below, we affirm appellant Townsell's judgment of conviction, but we reverse the conviction of appellant Holyfield.

The convictions of Holyfield and Townsell stem from an armed robbery at the Sierra Schools Credit Union in Reno on July 16, 1980. On that morning, two young black men entered the credit union brandishing handguns. After taking $6,700 in cash from the tellers' drawers, the robbers confined the credit union employees and a customer in a vault. As they fled, the robbers encountered the credit union's manager in the parking lot. They took her purse, papers, and a banking bag containing a deposit slip in the amount of $20,000. Then, they forced her into the trunk of her car where she remained for two hours.

Earlier that morning, at around 9:30 a.m., a witness driving by the credit union had observed three black males, wearing colored bandanas, sitting in a gold Chrysler automobile parked near the credit union. At approximately 11:20 a.m., the witness again drove by and noticed the same Chrysler. The Chrysler, still carrying three black men, pulled sharply in front of the witness into his lane of traffic, and ran two stop signs. The witness followed the car for some distance and, believing that the occupants were acting suspiciously, recorded the vehicle's license number. After reading about the robbery in the newspaper the next day, the witness reported his observations to the police.

Although the police determined that the vehicle was registered to Townsell, they allegedly could not locate the vehicle until two weeks later, on August 1, when it was being driven not by Townsell but by Holyfield. The police stopped the vehicle and arrested Holyfield on an outstanding warrant for an unrelated robbery of a Sparks movie theatre. The police siezed Holyfield's

glasses because, although they differed in color, they were similar in shape to glasses that reportedly had been worn by one of the robbers of the credit union. Holyfield was subsequently taken to the Sparks Police Department, given his *Miranda* warnings, and questioned directly by the police about the credit union robbery.[1] Holyfield denied any involvement in the credit union robbery.

While Holyfield was in custody in the Sparks City Jail, the Reno police detectives investigating the credit union robbery enlisted the aid of a long-time criminal and former San Quentin inmate named Obbie Jacobs, alias "George Shaw," who had a history of serving as an informant or "fink" to purchase favorable treatment for himself, and who was then residing in the Washoe County Jail. On or about August 24, 1980, police detectives placed Jacobs in the jail cell with Holyfield, admittedly to obtain incriminating statements about both the cinema robbery for which Holyfield had been arrested, and about the credit union robbery of which they had concluded Holyfield was also guilty. Upon exiting the cell the next day, Jacobs immediately related to the detectives his version of the statements Holyfield had allegedly made to him concerning both the cinema robbery and the credit union robbery. According to Jacobs, Holyfield admitted that he and two others had committed the credit union robbery.[2] After receiving Jacobs' taped statement, on August 28 Reno police formally arrested Holyfield, who was still in jail, for the credit union robbery. It was not until September 18, 1980, however, that both Holyfield and Townsell were formally charged with burglary, two counts each of robbery with use of a deadly weapon, and two counts each of kidnapping for the credit union incident. Holyfield was also charged with being an ex-felon in possession of a concealed firearm.

At trial, none of the six victims of the robbery or any other witness was able to identify Holyfield or Townsell as the perpetrators of the credit union robbery. Nor were any of these individuals able to identify Holyfield and Townsell in any of the pretrial lineups. Consequently, without any direct evidence, the state was forced to rely in large part upon Jacobs' testimony and upon that

---

[1] Detective Eubanks of the Reno Police Department, who apparently led the questioning, testified at appellant's trial: "I told Holyfield that the car he was driving in was seen being used as the getaway car from a credit union robbery on Bible Way in Reno. And I had information that I knew he did it, was part of it, and there were other people involved. And asked if he would like to tell me about it."

[2] At trial, however, Roy Joshua, a prisoner in the cell contemporaneously with Holyfield, testified that he overheard Jacobs questioning Holyfield and that Holyfield did not discuss the credit union robbery. Joshua testfied that Holyfield, in response to Jacobs' questioning, told Jacobs that "he didn't know what Jacobs was talking about."

of three other witnesses, two of them convicted felons, who were acquainted with appellants.

For example, Michael King, an ex-felon on probation, testified that on August 20, 1980, he gave a taped statement to the Reno police detectives following his arrest for a different offense. King told the police that he had a conversation with Townsell in August. According to King, he saw Townsell with about $5,000, and Townsell admitted to King that he and another person had robbed the credit union and fled with a third accomplice. King further described to the police the details of the robbery as allegedly related to him by Townsell. Additionally, according to King, Townsell stated that he left the Reno area because he knew police were looking for him for the credit union robbery and knew his car had been impounded. Interestingly, none of Townsell's statements to King implicated Holyfield.

The jury subsequently found Holyfield and Townsell quilty of all the counts charged. This appeal followed.

Appellants contend that the district court erred by refusing to suppress Jacobs' testimony concerning the incriminating statements Holyfield allegedly made to Jacobs while the two were confined in jail. Specificially, appellants contend that admission of this evidence violated Holyfield's constitutional right against self-incrimination because Jocobs was, in fact, an agent of the police and he had not advised Holyfield of his *Miranda* rights prior to speaking with him. We agree.

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inclupatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The ruling of *Miranda* applies to statements taken during a "custodial interrogation," which the Court defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 478 (footnote omitted). As for the procedural safeguards to be employed, *Miranda* requires that prior to questioning, the person must be warned that he has a right to remain silent, that any statement he makes may be used as evidence against him, that he has the right to have an attorney present, and that one will be appointed for him if he cannot afford one. *Id.* at 479. Because it is conceded that Holyfield was not given any of these warnings before he was subjected to inquiry by Jacobs, the issue presented is whether Holyfield's alleged admissions were the product of custodial interrogation initiated by the police.

We note initially that, although Holyfield was incarcerated on other charges at the time he allegedly made the incriminating statements to Jacobs, he was "in custody" for purposes of *Miranda. See* Mathis v. United States, 391 U.S. 1 (1968). As the Court in *Mathis* concluded, nothing in the *Miranda* opinion makes the necessity for warnings dependent on the particular reason the defendant is in custody. *Id.* at 4-5. As soon as a person is incarcerated for any reason, he must be given his *Miranda* warnings before he is interrogated. Therefore, we conclude, and the state concedes as much, that Holyfield was indeed "in custody" for purposes of *Miranda* when Jacobs conversed with him.

Second, there is no doubt that Jacobs, upon agreeing to foster police efforts to inculpate Holyfield, became an agent of the police. Police detectives placed Jacobs in the jail cell with Holyfield, admittedly to seek incriminating statements about both the robbery for which Holyfield had been arrested and the credit union robbery of which he was suspected. Although the prosecution maintains that the police instructed Jacobs not to question Holyfield, the prosecution has conceded that the police in fact expected him to do so, and that Jacobs knew he was expected to elicit information from Holyfield.[3] The only question that

---

[3]On at least three occasions in response to questions by this court at oral argument, the State conceded that Jacobs knew they expected him to elicit information from Holyfield:

> Court: He knew that they wanted him to get into a conversation about the robbery, though; he knew that, didn't he?
> Prosecutor: Who did?
> Court: Jacobs.
> Prosecutor: Yes.
> Court: He absolutely knew that the purpose of putting him in the cell was so that he could get information from the defendant in this case.
> Prosecutor: That—that is clearly correct.
> . . .
> Prosecutor: The Police did want information through Obbie Jacobs, and Obbie Jacobs knew that he had a job to do when he got into the jail cell. I can see—
> Court: That's right. So they [the police] put him in there to bring the conversation around to the subject, and basically, subtly perhaps, but in fact—
> Prosecutor: No question about it.
> Court: No question about it that he was there to interrogate the defendant, right?
> Prosecutor: They told him not to interrogate him. But, yes, if you want to use the word "subtly" or whatever—
> Court: He was expected to conduct a subtle interrogation of this man, wasn't he?
> Prosecutor: He was told not to interrogate Mr. Holyfield, but yes, in a sense, you're correct.

remains, then, is whether Jacobs' conversation with Holyfield amounted to interrogation for purposes of *Miranda.*

The state maintains that Holyfield was not subjected to police interrogation, for several reasons. First, the state contends that Holyfield was not questioned by any figure of authority. Second, the state contends, there was no environment or atmosphere which in any way could be described as intimidating or coercive because Jacobs and Holyfield conversed in a dormitory cell which housed twelve other inmates. The state argues that Holyfield did not have to talk to Jacobs; he could have simply walked away. Third, the state contends that the police instructed Jacobs not to ask Holyfield any direct questions or attempt to initiate an interview with him. Fourth, the state argues that the police did not give Jacobs any details concerning the credit union robbery and, therefore, Jacobs was not in a position to elicit admissions from Holyfield. For the reasons discussed below, we reject these contentions.

In Rhode Island v. Innis, 446 U.S. 291 (1980), the Court held that "interrogation" under *Miranda* need not amount to actual questioning and may instead be the "functional equivalent" of such questioning. The Court defined the latter to include *"any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."*[4] *Id.* at 300 (emphasis added; footnotes omitted).

In the present case, the state concedes that Jacobs was acting as an agent of the police, that police deliberately placed Jacobs in Holyfield's cell in the hope of gaining incriminating testimony concerning Holyfield's assumed involvement in the credit union robbery, and that, since Jacobs and Holyfield were previously

---

. . .
    Court:   And I believe you also indicated that you couldn't argue with my statement that he knew that he was expected to elicit information from the defendant. Right?
    Prosecutor:   That's correct. I can't argue with that.
At trial, Jacobs confirmed that he was told Holyfield would be his cellmate and was "placed there for purposes of gathering information for them" about robberies the police believed Holyfield had committed.

[4]Although the court in *Innis* stated that this definition of interrogation primarily focuses on the perception of the suspect, this was to remove the necessity of proving the underlying intent of the police in ambiguous circumstances. *See id.* at 301. The court did, however, allow for inquiry into the intent of the police. "This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 301 n.7

acquainted, it was plausible Holyfield would talk to Jacobs about the robberies he had committed.[5] Moreover, it appears from the testimony of another witness, Roy Joshua, who had been a prisoner in the cell contemporaneously with Jacobs and Holyfield, that Jacobs performed as the police contemplated by repeatedly asking Holyfield questions about the credit union and cinema robberies, but that he never heard Holyfield mention the credit union robbery in response.

It is disingenuous to argue, as the state does here, that Jacobs did not interrogate Holyfield simply because Jacobs was allegedly "instructed" not to question Holyfield directly about the robbery. As we have noted, the police fully expected Jacobs to question Holyfield and Jacobs himself knew what the police expected.[6] We conclude, therefore, that Jacobs' conversation with Holyfield was the functional equivalent of express police questioning for purposes of *Miranda* under the test set forth above.

The record also refutes the state's suggestion that Jacobs could not have "interrogated" Holyfield because he had no prior information about the robberies. Jacobs had access to information concerning the credit union robbery because he was in Washoe County Jail with Michael King on August 20, 1980, the same day King reportedly gave Reno police detectives a taped statement concerning Townsell's involvement in the credit union robbery. Jacobs testified at trial that he received information from King about an unrelated crime and he went to Detectives Eubanks and Kimpton with this information. Jacobs, then, could have received information from King concerning the credit union robbery as well. Thus, Jacobs was in a position to elicit admissions or information concerning the credit union robbery from Holyfield. Likewise, he was in a postition to fabricate a story of alleged

---

[5]Indeed, at trial, Detective Eubanks testified:

The whole thing came about, was that Mr. Jacobs was placed in a cell in the Sparks Police Department by Sparks Police Department officers, at the request of myself and Detective Kimpton and Detective Zamboni of the Sparks Police.

. . .

Because Mr. Holyfield, the defendant, was acquainted with Mr. Jacobs from a prior contact in another detention facility. And that if Mr. Holyfield had any tendency to start talking about any crimes he might have done, that would be a very likely person he might make those statements to.

[6]Contrary to the state's suggestion, this is not a case of the police obtaining information through the misplaced confidence of Holyfield because Jacobs was working directly as a police agent. He was doing that which the police themselves could not do. *Compare* United States v. Brown, 466 F.2d 493 (10th Cir. 1972) *with* United States v. Mitchell, 417 F.2d 1246, 1249 (7th Cir. 1969).

admissions by Holyfield, which would satisfy the police and earn favorable consideration for himself.

Nor are we persuaded by the state's contention that Holyfield was not subjected to an intimidating or coercive atmosphere in the jail cell. As one commentator has noted,

> '[m]ere confinement might increase a suspect's anxiety, and he is likely to seek discourse with others to relieve his anxiety. That search, of course, may make him more susceptible to an undercover investigator seeking information about the offense for which the suspect has been arrested.' Confinement of the suspect increases the power of the police in an important respect. Because the suspect's ability to select people with whom he can confide is completely within their control, the police have a unique opportunity to exploit the suspect's vulnerability. In short, the police can insure that if the pressures of confinement lead the suspect to confide in anyone, it will be a police agent. In view of the government's control over the suspect's channels of communication, it is blatantly unfair to allow the government to exploit the suspect's vulnerability by trickery of this type.[7]

White, *Police Trickery in Inducing Confessions,* U.Pa.L.Rev. 581, 605 (1979) (footnotes omitted); *see also* U.S. v. Henry, 447 U.S. 264, 274 (1980); Dix, *Undercover Investigations and Police Rulemaking,* 53 Tex.L.Rev. 203, 230 (1975) (suggesting that a *Miranda*-type barrier should preclude use of the "jail-plant" tactic).

Under these circumstances, many jurisdictions have applied the requirements of *Miranda* notwithstanding the fact that a figure of authority did not conduct the interrogation. For example, in State v. Fuller, 281 N.W.2d 749 (Neb. 1979), a defendant confined in prison on unrelated charges was suspected of murdering a fellow prisoner. One of his cellmates agreed to cooperate with the prison authorities and attempt to induce the defendant to discuss his role in the inmate's death. The cellmate claimed to have succeeded, but the Nebraska Supreme Court held that the defendant's purported statements were inadmissible. "Since [the cellmate] was acting as a police agent, this was custodial interrogation and the defendant was entitled to the warnings required" by *Miranda. Id.* at 749.

In Commonwealth v. Hamilton, 285 A.2d 172 (Pa. 1971), Hamilton was arrested for burglary and was taken to a police station. At the time of his arrest, the police suspected Hamilton of

---

[7]It is, of course, especially unfair and dilutes due process when police utilize an agent whose character is so dubious that he may not relate conversations accurately, but instead may structure his reports in any way he believes will please the police and benefit himself.

having committed an unrelated murder. He was not advised of his rights under *Miranda*. Nevertheless, the police confronted Hamilton with his suspected accomplice, admittedly for the purpose of obtaining an incriminating statement from Hamilton. The individual accused Hamilton of being the triggerman in the crime; Hamilton sat mute for thirty seconds, and then proceeded to give an inculpatory statement. Stating that "a person whose freedom is restrained and who is a suspect must first be apprised of his constitutional rights prior to the initiation of any form of official interrogation be it direct or conducted indirectly through the offices of a third party," the Pennsylvania Supreme Court held Hamilton's statement inadmissible. *Id.* at 175. As the court noted, "[t]o sanction this technique without proper warnings would be to place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda* that a suspect in custody should be clearly advised of his rights before any attempt is made to induce him to speak." *Id. See also* Commonwealth v. Bordner, 247, A.2d 612, 617 (Pa. 1968) (incriminating statements made to his mother by an accused, who was confined in the hospital under police guard and who had not been advised of his *Miranda* rights, were inadmissible; "the circumstances reveal a plan on the part of the police authorities to use the mother as a police instrumentality in the interrogation of the accused son").

Similarly, in Tarnef v. State, 512 P.2d 923 (Alaska 1973), the defendant was incarcerated on an unrelated charge. The Alaska Supreme Court held that a private investigator, who was working closely with police on an arson investigation, who had promised to give police any statements he obtained, and who had obtained access to the defendant through the police, was required to administer the *Miranda* warnings to the defendant before questioning him. *Cf.* People v. Whitt, 685 P.2d 1161 (Cal. 1984) (absent evidence of complicity on the part of law enforcement officials, admissions or statements made by one prison inmate to another inmate infringed no constitutional guarantees); Commonwealth v. Mahnke, 335 N.E.2d 660 (Mass. 1975), *cert. den.*, 425 U.S. 959 (1976).

Again, in State v. Travis, 360 A.2d 548 (R.I. 1976), a police agent—longhaired, handcuffed, and dressed in "modtype" clothing—was led into the jail cellblock, where his handcuffs were removed and the agent was placed in the suspect's cell. The agent later claimed that, after he conversed with the suspect to put him at ease, the suspect made several statements amounting to a confession. On the basis of these alleged statements, the suspect was charged and convicted. As in the instant case, the state argued that the defendant's statements had not been compelled

but, rather, had been volunteered freely and, therefore, were admissible in evidence. In reversing the conviction, the Supreme Court of Rhode Island held, as we do, that the ruse employed by the police offended their state's constitution as well as the federal constitution, stating:

> We attach no significance as to whether the agent in the cell asked questions of the duped defendant or not. [Citations omitted.] To allow into evidence admissions made to an agent in the cell who made casual conversation with a defendant while carefully avoiding any questions regarding the specific crime under investigation, but to disallow that agent's testimony if he asked a question pertaining to a defendant's reason for being incarcerated, would be to play games with an individual's constitutional guarantees. . . .
>
> . . .
>
> The police were not allowed to interrogate defendant directly. There is no authority in these circumstances for the police to do indirectly what they may not do directly. [Citations and footnote omitted.] The police conduct here nullified defendant's privilege against compelled self-incrimination as guaranteed by the Constitution of Rhode Island, art. 1, § 13, and the fifth amendment of the United States Constitution.
>
> . . .

*Id.* at 551. We therefore reject the state's contention that *Miranda* applies only to those situations in which a figure of authority directly interrogates an accused.[8]

It is simply not enough to attempt to ascertain mechanically what police-initiated "interrogation" means without considering the rationale underlying the *Miranda* decision and the Fifth Amendment. The Court in *Miranda* emphasized that warnings were necessary to help aid the truth-finding function in a criminal proceeding, and to assure trustworthiness and accuracy in the reporting of a defendant's statement. Miranda v. Arizona, 384 U.S. at 470. As the Court noted, a defendant must be advised of his right to have counsel present, because the presence of counsel

---

[8]The prosecution has cited only one decision to support its contention, *i.e.* State v. McDonald, 387 So.2d 1116 (La. 1980), in which two justices strenuously dissented, supporting the prevailing view, as articulated herein, and stating *inter alia*: "In my judgment it is a violation of an accused's *Miranda* rights for the police to accomplish by subterfuge and trickery, in the form of a paid informer, that which the police cannot do under color of law. In this instance, the informer was not compensated in material form, but in the form of a promise of leniency and the dismissal of criminal charges pending against him. He was acting with the consent of, pursuant to the authority of, and subject to the direction and supervision of the police. He was in law and in fact an agent of the police." 387 So.2d at 1124.

mitigates the dangers of untrustworthiness, and helps to "guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial." *Id.*

The present case graphically illustrates the importance of *Miranda* warnings in aiding the truth-finding function. Here, Jacobs, the police informant who interrogated appellant, was a twice-convicted felon, an escapee, and a former San Quentin inmate who was clearly acting in his own self-interest when he agreed to seek incriminating statements from appellant.[9] Any report Jacobs made to the police was therefore of a suspect nature. Further, because the conversation took place without any procedural safeguards, there is no assurance that Holyfield made the statements Jacobs attributes to him. In fact, as noted above, one cellmate testified that no such statements were made. Accordingly, this important function of the *Miranda* warnings was clearly subverted by the police practice in this case.

As the Court noted in *Miranda,* "[O]ur accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. . . . In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " *Id.* at 460, *quoting* Malloy v. Hogan, 378 U.S. 1, 8 (1964). In the present case, Holyfield's alleged statements were not given through a knowing and intelligent waiver of his rights, but instead were the questionable product of an intentional subversion of those rights.

The procedural safeguards set forth in *Miranda* are the only established means to protect a defendant's rights under the Fifth Amendment and under article 1 section 8 of the Nevada Constitution. We therefore cannot permit the police to subvert these important constitutional rights by engaging in the surreptitious tactics used in this case. To do so would in effect render a defendant's substantive rights under our state and federal constitutions wholly meaningless.[10]

---

[9]Contrary to the state's suggestion, it appears that Jacobs benefitted from his participation in this scheme. The record reveals that a representative of the Reno Police Department wrote a letter to the Parole Board indicating that Jacobs had cooperated with law enforcement authorities. Moreover, Jacobs was paroled after serving 19 months of a two-year prision sentence. Interestingly, Jacobs served this time in the county jail, rather than the state prison.

[10]Wholly apart from our discussion of federal law, we hold that the conduct of the police in this case denied Holyfield the privilege against self-incrimination guaranteed by article 1 section 8 of the Nevada Constitution.

Finally, the state alternatively contends that even if Holyfield's Fifth Amendment rights were violated by the admission of Jacob's testimony, we should conclude that any error was harmless beyond a reasonable doubt. *See generally* Chapman v. California, 386 U.S. 18 (1967). With regard to appellant Holyfield, we disagree. Absent Jacobs' testimony, the evidence presented against Holyfield was not in any way overwhelming. In particular, no direct evidence existed implicating Holyfield, and none of the six victims was able to identify Holyfield as one of the perpetrators of the robberies. We have no doubt that the jury's verdict of guilt in Holyfield's case rested in large part upon the admission of Jacobs' self-interested statements. Accordingly, we cannot say that a jury would have found Holyfield guilty beyond a reasonable doubt without Jacobs' testimony.

Appellant Townsell contends that admission of Jacobs' testimony that Holyfield "told me the car [used in the robbery] belonged to a man named Duane Townsell" violated Townsell's Sixth Amendment right to cross-examine his accusers because Holyfield chose not to testify at trial. *See* Bruton v. United States, 391 U.S. 123 (1968). Before Jacobs testified, however, both King (who testified that Townsell had admitted his car was used in the robbery) and another witness (who testified that he followed the car from the credit union and recorded its license plate number) had been on the stand. Given this evidence, Townsell was not harmed by the admission of Jacobs' testimony. United States v. DiGeronimo, 598 F.2d 746, 754 (2d Cir.), *cert. den.,* 444 U.S. 886 (1979).

We have reviewed the record and conclude that sufficient evidence was presented at trial as to appellant Townsell to establish his guilt beyond a reasonable doubt, as determined by a rational trier of fact. *See* Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980). We will, therefore, not disturb his judgment of conviction.

In conclusion, we recognize that the exigencies of the modern day call for sophisticated and resourceful law enforcement methods. We have no wish to interfere with innovative police practices

---

As the *Miranda* court did in discussing the Fifth Amendment, we have stated that the privilege is intented to promote the truth-finding function in criminal proceedings. *See* State of Nevada v. Ah Chuey, 14 Nev. 79, 82-83 (1879).

Although appellants do not raise a Sixth Amendment challenge to the admission of Jacobs' testimony, we note that the State has seen fit to argue that Holyfield's Sixth Amendment rights were not violated. In light of our conclusion that Holyfield's rights against self-incrimination were violated by the admission of Jacobs' statements, and that Jacobs' statements were therefore inadmissible, we decline to address the state's arguments concerning the Sixth Amendment.

so long as they do not diminish rights fundamental to the American form of government. Nonetheless, this court is obligated to enforce the constitutions of the United States and Nevada, and we therefore cannot permit police ploys that subvert constitutional guarantees which are designed to assure fairness and integrity in the truth-seeking process. "Disinterested zeal for the public good does not assure either right or wisdom in the methods it pursues." Haley v. Ohio, 332 U.S. 596, 605 (1948) (Frankfurter, J., concurring).

We have considered appellants' remaining contentions and we conclude that they are without merit. Accordingly, we hereby affirm appellant Townsell's judgment of conviction. For the reasons set forth above, however, we hereby reverse appellant Holyfield's conviction and remand his case for a new trial.

SPRINGER, C. J., concurs.

YOUNG, J., concurring:

While I fully concur in and endorse the opinion of the court, I add these observations in support of it.

As the dissent notes, an important policy underlying the fifth amendment's proscription against the use of compelled testimony is the prevention of extorted admissions of guilt. However, a paramount concern is also the need to insure that purported admissions have actually been made as reported. Miranda v. Arizona, 384 U.S. 436, 470 (1966). This concern is especially great where the state seeks to rest upon the uncorroborated testimony of a twice-convicted felon with a self-serving motive to produce inculpatory information. Accordingly, while the suggestion has been made that the majority's statement of the issue presented here is "rhetorical and excessively judgmental," I respectfully suggest that the dissent's alternative statement of the issue is misdirected. I believe an examination of the cases relied upon by the dissent will make this quite clear.

1. Rhode Island v. Innis, 446 U.S. 291 (1980), is cited for the proposition that, for purposes of *Miranda,* the definition of "interrogation" focuses *solely* upon the "perceptions of the suspect." Absent from this analysis is a discussion of footnote 7 of the *Innis* opinion wherein the Supreme Court made it clear that the intent of the police is relevant in determining whether a suspect has been "interrogated" for purposes of *Miranda:*

> This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will

not also be one which the police should have known was reasonably likely to have that effect.

*Id.* at 301-02 n. 7.

In the present case, it is clear that the police expected Jacobs to elicit, or claim to have elicited, admissions from Holyfield. The dissent concedes as much by noting that, under these circumstances, "Holyfield yielded his admissions [or Jacobs fabricated them] to an orchestrated deception by the State." It seems, then, somewhat contradictory to conclude also that the police did not expect "that the jail cell scenario would produce incriminating statements by Holyfield."

2. In People v. Wojtkowski, 213 Cal.Rptr. 846 (Ct.App. 1985), a husband savagely beat, raped, and sodomized his wife in California and then fled to Illinois. California police placed a recorder on the wife's telephone, not merely to obtain admissions, but for the purpose of apprehending the husband and of protecting the wife and children. While still a fugitive from justice, the husband telephoned the wife three times in an attempt to persuade her not to testify against him. He called her again, after being apprehended and being placed in the Ventura County Jail. At the time of the last call, the recorder had not yet been removed from the wife's phone. The trial court admitted all four recordings against the husband during his prosecution, and the California Court of Appeal upheld their admission in part because neither a police agent nor interrogation was involved. The wife, the court noted, was not a police agent but a victim and the complaining witness. The husband in all instances initiated the conversations, and made his admissions during them, without instigation by the wife or contrivance by the police. Obviously, therefore, the operative facts of the *Wojtkowski* case are totally dissimilar from those in the instant one. (In addition, I note in passing that, in view of the recordings, there was absolutely no doubt that the admissions had been made.)

3. Similarly, in People v. Aalbu, 696 P.2d 796 (Colo. 1985), the first contact between the defendant and the informant was initiated by the defendant and not the police. The defendant, while incarcerated, as a condition of probation on a recent drug conviction, met with the informant (James Ross, who had served as a police informant on prior occasions) and engaged in converstations concerning the defendant's plan to kill Mark Olson who along with defendant had been convicted of violation of drug laws. Ross then reported these conversations to the police. Ross agreed to participate in further discussions in exchange for money payments and favorable consideration on criminal matters pending against himself. As part of their investigation, the police arranged for the informant's release from jail and recorded tele-

phone calls initiated by the defendant to the informant so the defendant's murder scheme could be thwarted before he could bring it to fruition. The defendant unsuccessfully sought to suppress the taped telephone conversations. Relying upon Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136 (1984), the Colorado court held that no fifth amendment violation had occurred. The defendant in *Aalbu* was not under suspicion for commission of a crime, he initiated the conversations with the informant, the conversations were recorded, and there was no doubt that they occurred or that the admissions had been made. The State was not relying solely upon the testimony of a felon, but upon recordings of the defendant's conversations.

4. In Minnesota v. Murphy, *supra,* relied upon in *Aalbu,* the defendant made incriminating admissions during a regularly scheduled meeting with his probation officer. The Court rejected the defendant's fifth amendment challenge to the use of those admissions in his subsequent prosecution. The Court concluded that the defendant had not been subjected to custodial interrogation for purposes of *Miranda* when he made the incriminating statements, *because he was not in custody.* 465 U.S. _____, 104 S.Ct. at 1144-46.

5. People v. Konke, 268 N.W.2d 42 (Mich.App. 1978), involved the admission of conversations had between a suspect and an undercover police agent equipped with a recording device. The conversations transpired in a public place; the defendant was not in custody. Because there was no custodial interrogation, the Michigan Court of Appeal properly held that no *Miranda* warnings were required.

6. Milton v. Wainwright, 407 U.S. 317 (1972), was decided on a harmless error standard. A majority of the court expressly refused to reach the question of whether the defendant's rights under the fifth and sixth amendments had been violated when an undercover police officer was placed in his cell. Four justices, dissenting, concluded that the State could not place an undercover police agent in a prisoner's cell in the hope of eliciting a confession. Accordingly, *Milton* has little relevance to the fifth amendment issue before this court. If it supports anyone, it supports this court's majority.

7. United States v. Leon, 104 S.Ct. 3405 (1984), represents the Supreme Court's unwillingness to require an exaggerated response to technical and unintended police violations. Such violations are not involved here. Instead, we are presented with activity on the part of the police that was designed to frustrate the rights guaranteed by *Miranda.* The other cases cited in connection with *Leon* involve circumstances unrelated to the issue presented in this case.

8. It has been suggested that this is simply a case of one friend (Holyfield) misplacing trust in another (Jacobs). As the majority note, however, "this is not a case of the police obtaining information through the misplaced confidence of Holyfield *because Jacobs was working directly as a police agent.*" The dissent overlooks the decision in United States v. Brown, 466 F.2d 493 (10th Cir. 1972). This case clearly holds that it would be improper to place an undercover policeman in a prisoner's cell in the hope of eliciting inculpatory statements. When the police resort to tactics of this sort, they trick a defendant into relinquishing important consitutional protections. If the use of an undercover policeman is proscribed by the fifth amendment, certainly the use of a police agent with a self-serving motive to produce is likewise prohibited.

9. Finally, I note that cases based on sixth amendment analysis have little relevance to the fifth amendment issue presently before the court. Consequently, the majority has scrupulously refrained from relying on the vast body of case law holding that the police may not place an informant in an accused's cell, to elicit incriminating information from the accused about the charge for which he is incarcerated, without violating his sixth amendment right to counsel. *See, e.g.,* State v. McCorgary, 543 P.2d 952, 958 (Kan. 1975); State v. Smith, 482 P.2d 863 (Ariz. 1971); *cf.* Massiah v. United States, 377 U.S. 201 (1964). Reference to these cases obscures the real issue before the court.

Although I share the dissent's belief that the truth-finding function is the rightful province of the jury, it is no answer to the problem posed by Jacobs' lack of credibility to assert that the jury is equipped to find facts and to assess the credibility of witnesses. The law requires the state to prove the elements of a crime without resorting to the simple expedient of compelling a confession from the accused. A major reason for this requirement is the inherent unreliability of a compelled confession and the possibility that a jury will be unfairly prejudiced by an apparent admission of guilt. These concerns are heightened when the state relies on the uncorroborated testimony of a self-interested informant, especially when the testimony is controverted by the alleged confessor. The possibility of false testimony increases dramatically when the state undertakes to place a convicted felon in a jail cell with an accused for the express purpose of eliciting an incriminating statement. In this case, Jacobs' testimony was so inherently unreliable that, in my opinion, it should not have been placed before the jury.

STEFFEN, J., with whom MOWBRAY, J., agrees, dissenting in part and concurring in part:

I respectfully dissent from the majority's reversal of appellant Holyfield's conviction but concur in the affirmance of appellant Townsell's judgment of conviction.

The majority describe the central issue on appeal in terms of whether police officers may "subvert" a suspect's federal and Nevada constitutional rights under the Fifth Amendment and article 1, section 8, respectively. The issue, thus framed, is both rhetorical and excessively judgmental. It beckons an answer that is unmoored to the facts and the law applicable to this case. It is true, of course, that no group, individual or entity may lawfully "subvert" any aspect of our fundamental law. But the real issue here is whether law enforcement authorities may lawfully use non-professional jail cell informants to obtain inculpatory information from a suspect regarding an uncharged crime.

A meaningful resolution of the issue presented by this case demands analysis of the policy interests underlying the issue. This leads to the seminal case of Miranda v. Arizona, 384 U.S. 436 (1966). The *Miranda* court specified the concerns of the opinion as "the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." I suggest that the operative words of the quoted material are "subjected to" and "compelled." Indeed, this is demonstrated by the Court's description of the circumstances common to each of the admissions secured by police interrogators in the four cases decided in *Miranda:* "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." The Court also observed the history of extortive police methods based upon physical or mental intimidation, or both, conducted incommunicado for the express purpose of securing confessions of guilt. In short, the Court recognized, as do I, that the Fifth Amendment right against compelled self-incrimination would be shorn of meaning if a suspect could be lawfully subjected to physical or mental intimidation calculated to break the exercise of free will. Manifestly, if such overbearing methods of law enforcement were judicially condoned, the tragic prospect of convicting innocent persons would be greatly increased. Thus, the policy underlying *Miranda* is identical to that of the Fifth Amendment and its counterpart in the Nevada Constitution, viz, to prevent extorted admissions of guilt from innocent suspects.

Since the majority have concluded that Holyfield was the victim of custodial interrogation without first being advised of his *Miranda* rights, it is important to consider the meaning of "custodial interrogation" as defined by the United States Supreme

Court. In *Miranda,* the Court explained: "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. The Court's concern in *Miranda,* as we recognized in Schaumberg v. State, 83 Nev. 372, 374, 432 P.2d 500, 501 (1967), focused on the *compulsion* which can be created by "the *interplay* of interrogation and custody." Rhode Island v. Innis, 446 U.S. 291, 299 (1980) (emphasis added).[1] Self-incriminating statements which are not the result of such compulsion are admissible despite the lack of *Miranda* warnings. As the Court in *Miranda* noted:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478 (footnote omitted).

The compulsion, moreover, must exceed that which the prisoner naturally feels as a result of being in jail. Custody *and* interrogation are each prerequisites to the necessity of *Miranda* warnings. The court in *Innis* proclaimed:

> It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. *"Interrogation,"* as conceptualized in the *Miranda* opinion, *must reflect a measure of compulsion above and beyond that inherent in custody itself.*

446 U.S. at 300 (emphasis added and footnote omitted.) The Supreme Court went on to expound the meaning of "interrogation" under *Miranda,* explaining:

> [T]he Miranda safeguards come into play whenever a person in custody *is subjected* to either *express questioning or its*

---

[1] For a compelling discussion of the interplay of "interrogation" and "custody," *see* Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does It Matter?,* 67 Geo.L.J. 1, 63-65 (1978).

*functional equivalent.* That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the *perceptions of the suspect,* rather than the intent of the police.

*Id.* at 300-01 (emphasis added and footnotes omitted).

As previously stated, the critical issue before us has to do with the constitutional propriety of enlisting the aid of an informant in a jail cell environment to obtain incriminating information from a suspect. The majority refer at length to a colloquy between the prosecutor and a member of this Court as if to reveal startling admissions of culpability on the part of the state in placing an informant in a jail cell for the purpose of obtaining information from the defendant concerning his criminal activities. Absent is the incommunicado interrogation in a police-dominated atmosphere; absent is the aspect of intimidation, physical or mental; absent is the compulsion to speak or associate; absent is the authority figure through which a form of intimidation may be accomplished; absent is a process calculated to break down the exercise of free will. Present is the feigned appearance of friendship or common plight inducing hoped-for admissions by the defendant who spoke freely, voluntarily and without compulsion, intimidation or stressful setting. Under conditions thus described, I see no encroachment on the dictates or policy concerns of *Miranda.* Where my brethren see constitutional barriers, I see effective, resourceful and lawful police work.

In the recent, unanimous opinion of the Colorado Supreme Court, sitting en banc, People v. Aalbu, 696 P.2d 796 (1985), the people prevailed under conditions far more offensive to my brethren in the majority than those found in the instant case. In *Aalbu,* the defendant was convicted of criminal solicitation to commit first degree murder. The evidence against the defendant consisted primarily of conversations between the defendant and a cellmate, James Ross, a police informant with an incentive to produce. Ross agreed to engage the defendant in conversation that was expected to be incriminating in exchange for money and favorable consideration on criminal charges pending against him. Citing Minnesota v. Murphy, 104 S.Ct. 1136 (1984), the Colorado Supreme Court held that "the privilege against self-incrimination protects against governmental compulsion to answer questions, not against voluntary conversation. In situations where a person is free to speak or not to speak at all [as was the case here], the privilege is generally not applicable." The court then adverted to

the exception involving "inherently coercive custodial interrogations" covered by *Miranda* and noted that the *Miranda* safeguards have no application outside the context of such interrogations. Minnesota v. Murphy, 104 S.Ct. 1144, quoting Roberts v. United States, 445 U.S. 552, 560 (1980). Moreover, the Colorado court concluded that the admission of the defendant's statements to the informant did not violate Aalbu's Sixth Amendment right to counsel. Observing that Aalbu's incarceration was the result of sentencing under an unrelated crime, and that no charges were pending against the defendant for criminal solicitation when the informant was dispatched to gather inculpatory statements, the court held that no right to counsel existed in connection with the latter offense that could have been violated by the informant's conduct.

State v. McDonald, 387 So.2d 1116 (La. 1980), *cert. denied,* 449 U.S. 957 (1980), represents a case where a police informant was placed in a jail cell with an inmate suspected of criminal homicide. The informant, who was a friend of the suspect, cooperated in obtaining incriminating admissions from the suspect in exchange for the dismissal of charges against him. On appeal from a conviction of first-degree murder, the defendant claimed the trial court erred in admitting his inculpatory statements to the informant, a police agent, who assertedly violated his Fifth Amendment right against self-incrimination by failing to give him a *Miranda* warning. Noting that the informant's questions were not posed by a figure of authority and that the atmosphere was free of intimidation, the court concluded that the defendant's admissions were not the result of a custodial interrogation requiring *Miranda* warnings. The court also observed that: "[t]he case presented here is that of one friend misplacing confidential information with another who, in turn, used it to his own advantage. The misplacement of such confidence did not require the safeguards required by *Miranda* in custodial interrogation." The *McDonald* court also dispensed with the Sixth Amendment issue by holding that a person's right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated." At the time of his inculpatory statements to the informant, the defendant had not yet been indicted; his incarceration was attributable to an unrelated matter.

In People v. Wojtkowski, 213 Cal.Rptr 846 (1985), the defendant placed a call from county jail to his wife who was the victim of his criminal assaults. The police had the victim record the conversation unbeknown to the defendant. In refusing to suppress the recorded admissions, the court held, *inter alia,* that:

> Defendant's argument also fails because courts have agreed that questioning by a police agent does not involve "interrogation" as long as the defendant is unaware of the agent's

relationship with the government. (Ringel, William. "Search and Seizure, Arrests and Confessions" (1984) p. 27-37). The premise for these decisions is that the *interplay* of interrogation and custody would "subjugate the individual to the will of his examiner." (Rhode Island [v. Innis], 446 U.S. 291, 299, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297). If an individual is unaware of government involvement, he cannot reasonably be thought to experience pressure or coercion.

Turning again to the case before us, police officials gained the cooperation of Obbie Jacobs in engaging Holyfield in conversation in the jail cell. Holyfield was incarcerated after an arrest for an unrelated robbery, and law enforcement authorities hoped that Holyfield would speak to Jacobs about the crime for which he was being held and also about the credit union robbery that he was suspected of committing. Jacobs testified that the police gave him no details regarding any robbery, no directions, and no specific questions to ask Holyfield. Jacobs was informed that Holyfield was in custody for one robbery, but was not told that he was under suspicion for another.

The detective who "planted" Jacobs in Holyfield's cell also testified that he gave Jacobs no details concerning any robbery. He told Jacobs to be an "ear" for the police concerning any criminal activity, as well as the whereabouts of some recently stolen dynamite. Jacobs was told not to instigate any discussion or to question the prisoner. He was then placed in the dormitory cell containing Holyfield and twelve other prisoners. One prisoner, Roy Joshua, testified that Jacobs asked Holyfield and other prisoners questions and that he overheard Jacobs and Holyfield discuss the cinema robbery, but not the credit union robbery. Jacobs, however, testified that Joshua was not present during his conversation with Holyfield and that Joshua's bed was on the opposite side of the room.[2]

The majority view the composite of Holyfield's custody on an unrelated charge and Jacobs' presence as a police agent as the equivalent of custodial interrogation mandating *Miranda* warnings. In seeking to buttress this conclusion, the majority cite Rhode Island v. Innis, *supra,* and then indulge in characterizing and weighing the evidence as if this were an appellate court prerogative. First, the majority assign footnote priority to the most significant aspect of the *Innis* holding upon which they seek to rely. In analyzing the "functional equivalent" of "interrogation" as defined by *Miranda,* the *Innis* court specified that the functional equivalent to "interrogation" that police should

[2]"Consideration" Jacobs received for his assistance was a letter from the Reno police department apprising the parole board of Jacobs' cooperation. Jacobs served nineteen months of a two-year sentence.

understand would likely produce an incriminating response from a suspect refers to *the perceptions of the suspect* rather than the intent of the police. This, of course, simply reemphasizes the element of coercion that must coexist with custody in order to violate a suspect's Fifth Amendment rights. As noted by Professor Kamisar, "if it is not 'custodial police interrogation' *in the eye of the beholder,* then it is not such interrogation within the meaning of *Miranda." See* footnote 3, *infra.* Thus, the court covered coercive police practices that could not be characterized as interrogation but would, by design, have the same effect. A hypothetical example of such conduct might be the placement of a suspect in an isolated cell within sight of an enlarged, grotesque photograph of a murder victim. The combination of time, isolation and photograph could reasonably be viewed as a police practice constituting the functional equivalent of custodial interrogation; a practice that the police may view as being reasonably likely to eventually elicit an incriminating statement resulting from a breakdown of the suspect's free will.

The majority overlook the requirement, under both *Miranda* and *Innis,* that a suspect in custody be "subject to" express interrogation or its functional equivalent. This aspect of interrogation relates to the captive attention a suspect must give to the questions or actions of his captors. A suspect such as Holyfield who was free to walk away from questions or any "functional equivalent" thereof, is hardly "subject to" interrogation. Moreover, subjecting a suspect to custodial police interrogation implicates an aspect of unrelenting verbal assault designed to break the suspect's will. Thus, the Court in Minnesota v. Murphy, *supra,* declared that "the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained." 104 S.Ct. at 1145. Again, this major source of inherent coercion was entirely absent in the informal discussions between Holyfield and Jacobs.

Moreover, in focusing on "the perceptions of the suspect," it is simply free of doubt that Holyfield's admissions were voluntary and untainted by any coercive element. Holyfield freely conversed with Jacobs as a fellow inmate in the unintimidating environment of a dormitory cell with twelve other prisoners. Holyfield's agency remained uncompromised by Jacobs' presence since the latter presented no figure of authority[3] and Holyfield

---

[3]One commentator, referred to by the Supreme Court in *Innis,* 446 U.S. at 300, explains: "It is the suspect's *awareness* that he is talking with, and being talked to by, the police that generates the 'inherently compelling pressures' of in-custody interrogation that *Miranda* warnings are supposed to dispel. *See* 384 U.S. at 467." *Kamisar, supra* n. 1, at 51. The commentator also reasons that in the "jail plant" situation, which we have in the instant

was free to tolerate Jacobs' conversation and association or not as he pleased. Jacobs was neither trained nor prepared to provide a psychological priming for a Holyfield response; consequently, Holyfield was not subject to any psychologically coercive police practices such as those that aroused the ire of the *Miranda* majority.[4] Jacobs was simply interjected in the Holyfield environment as an equal to absorb whatever Holyfield was willing to give him. Under such circumstances, I do not perceive the evil deprecated by *Miranda* and *Innis*. It is, of course, apparent that Holyfield yielded his admissions to an orchestrated deception by the State. Jacobs, clothed as a friend, functioned as a police agent. But in doing so, Jacobs did nothing more than take advantage of Holyfield's willing but unwitting inclination to reveal the details of his criminal enterprise to one he perceived as a friend. There was no scheme, artifice or conduct designed to pry from Holyfield's mind that which he was not wont to share freely with a fellow prisoner. Under such circumstances, I cannot conclude that the police should have reasonably expected that the jail cell scenario would produce incriminating statements by Holyfield.

Although I do not consider the point relevant, it is true that a fellow inmate, Joshua, who shared the cell with Holyfield, testified that Jacobs questioned Holyfield. Jacobs, on the other hand, testified that Joshua was never in a position where he could overhear any conversation between Holyfield and Jacobs. Jacobs was not asked whether he directed questions to Holyfield, but, as noted previously, he was instructed not to do so by the detective who placed him in the cell with Holyfield.[5] Furthermore, Joshua

---

case, there is no integration of "custody" and "interrogation" (with which the court in *Miranda* was so concerned) where such interplay counts—in the suspect's mind.

> [How] can one envelop someone in a "police-dominated atmosphere" without having him realize it? How can one produce an "interrogation environment" well calculated to "subjugate the individual to the will of his examiner" when the individual is not even aware that he is in the presence of "his examiner"? That is why, I submit, whatever may lurk in the heart or mind of the fellow prisoner (or apparent friend or colleague), if it is not "custodial police interrogation" *in the eye of the beholder,* then it is not such interrogation within the meaning of *Miranda.*

*Id.* at 65.

[4]*See Miranda,* 384, U.S. at 448-55. Some of those condemned practices which "subjugate the individual to the will of his examiner," as reviewed by the High Court in *Innis,* include: a coached witness picking out the accused in a lineup; a coached witness picking out the suspect as the perpetrator of a fictitious, more serious crime; and, psychological ploys positing the guilt of the subject, minimizing the moral seriousness of the offense and casting blame on the victim or society. 446 U.S. at 299.

[5]The majority imply credibility to the testimony of the convicted felon, Joshua, while apparently attributing a lack thereof to the police detective who testified that he instructed Jacobs to be an "ear" for the department without

also stated that he warned Holyfield not to confide in Jacobs as he was suspicious of the purpose for which Jacobs was placed in the cell. Giving credence to Joshua's testimony, it is nevertheless clear that any express questioning of Holyfield by Jacobs was not of the objectionable variety referred to in *Innis.* The type of interrogation considered by *Innis* to be within the pale of *Miranda,* whether in the form of express questioning or its functional equivalent, must contain an element of compulsion beyond that which is intrinsic to incarceration. 446 U.S. at 300; *see also* United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981).

It is also apparent that the State is not doing indirectly what it may not do directly. When the police planted Jacobs in Holyfield's cell, concealing the fact that Jacobs was a police agent, they were not performing an interrogation at all. Rather they were relying on Holyfield's misplaced confidence that Jacobs would not reveal his admissions of wrongdoing. The privilege against self-incrimination is not violated when a suspect unwittingly incriminates himself in the presence of a "friend" who is actually an informant.[6] *See* People v. Konke, 268 N.W.2d 42 (Mich. 1978); State v. McDonald, *supra,* People v. Aalbu, *supra.*

The Fifth Amendment right not to incriminate oneself is one of the fundamental values of our society. I therefore strongly share judicial concerns about human contrivances that may be employed to extract admissions of guilt contrary to the free will of the suspect. However, the Fifth Amendment was designed as a shield, not a sword. There are simply no social values to be

---

directing questions to Holyfield. In an effort to buttress their position disfavoring the testimony of the detective, the majority cite the colloquy between a member of this Court and an uninvolved deputy district attorney who merely argued this case on appeal. Although the colloquy reflects substantial speculation and is totally irrelevant, I am troubled by the apparent attempt to credit the testimony of the felon, Joshua, at the expense of a law enforcement officer and the prosecution. If the subtle point to be discerned from the majority's adumbrations is disdain for the use of "snitches" in police investigative work, I strongly suggest that the effort is inappropriate for the judicial branch of government. In any event, it was the rightful province of the jury, who heard the testimony and observed the demeanor of witnesses, to determine issues of credibility.

[6]As Holyfield in part does here, petitioner in Milton v. Wainwright, 407 U.S. 371 (1972), challenged the admissibility of incriminating statements he made to a police officer posing as a fellow prisoner on Fifth and Sixth Amendment grounds. The Supreme Court, while denying habeas corpus relief without reaching the merits of the petitioner's claims, found no "violation of federal constitutional standards." *Id.* at 377. Contrary to Holyfield, moreover, Milton had already been indicted for the crime being reviewed by the Court. The Court affirmed the denial of habeas corpus relief and found that any possible error in the admission of the challenged confession was harmless beyond a reasonable doubt in light of three other unchallenged confessions and strong corroborative evidence of Milton's guilt.

served by judicially excising the key element of compulsion from the *Fifth Amendment guaranty against compelled self-incrimination.* Indeed, in the face of public exasperation with criminal trends, the U.S. Supreme Court has, in several instances, contracted the panoply of armameñtaria accorded criminal defendants. As recent examples: United States v. Leon, 104 S.Ct. 3405 (1984), substantially eroded the Court derived exclusionary rule by engrafting an exception based upon an objectively reasonable reliance by police on a subsequently invalidated search warrant; Minnesota v. Murphy, *supra,* validated a confession of rape and murder to a probation officer in spite of requirement that a probationer be truthful "in all things" with probation officer and in spite of an anticipation of the confession by the probation officer who did not give the confessant his *Miranda* rights; Pully v. Harris, 465 U.S. 37 (1983), declared that proportionality review was not constitutionally required in capital cases; and Oregon v. Elstad, 105 S.Ct. 1285 (1985), held that the Fifth Amendment does not require the suppression of a properly obtained confession that followed an earlier admission secured by police without *Miranda* warnings. In short, it appears that concerns over issues of innocence and guilt are beginning to make sensible inroads among what many jurists have viewed as exaggerated judicial responses to instances of police abuse, both real and theoretical. I therefore view with some measure of concern this Court fashioning a rule that effectively eliminates a major investigative tool that should remain part of the law enforcement arsenal.[7]

---

[7]In so doing, the majority have described their position as being in accord with the "prevailing view." In analyzing the cases cited by the majority as being supportive of this assertion, it would appear that only one case seems to provide a basis for such support. For example, in Tarnef v. State, 512 P.2d 923 (Alaska 1973), a private arson investigator was given access to the incarcerated suspect by the police for purposes of taking a formal statement; the private investigator, who did not withhold his identity, claimed he gave the suspect his *Miranda* rights, while the suspect contrarily maintained that the statement was given upon promise that no charges would be filed and the suspect would receive a monetary reward for helping to apprehend the party who contracted for the arson. In People v. Whitt, 685 P.2d 1161 (Cal. 1984), no decision was made concerning the use of informants under the Fifth Amendment and the opinion was decided on the basis of Massiah v. United States, 377 U.S. 201 (1964), a Sixth Amendment issue. State v. Travis, 360 A.2d 548 (R.I. 1976), involved a suspect who expressly refused to speak to police without first consulting an attorney; thereafter, a trained, undercover *police officer* was placed in the cell to obtain incriminating information. Commonwealth v. Hamilton, 285 A.2d 172 (Pa. 1971), involved a clear violation of *Miranda* in that police officers, who had earlier questioned Hamilton for several hours, surrounded the suspect, handcuffed him to a chair, and confronted him with an accomplice who declared that Hamilton had killed the victim. Hamilton responded with incriminating statements of lesser involvement than his accuser. In Commonwealth v. Bordner, 247 A.2d

Although confined, Holyfield's admissions to Jacobs were the product of his own will, freely expressed. There was no compulsion or intimidation, however subtle, designed to separate Holyfield from his natural inclinations and thought processes. However misplaced his trust, it was Holyfield's decision to confide in Jacobs and discuss his criminal activities. In Minnesota v. Murphy, *supra,* the United States Supreme Court stated:

> . . . the *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it. . . . We have consistently held, however, that this extraordinary safeguard "does not apply outside the context of the inherently coercive custodial interrogations for which it was designed."

104 S.Ct. at 1144 (cites omitted).

The majority, of course, have offered no explanation for their rule that excludes voluntary admissions unwittingly made in the complete absence of *coercion,* the key element that triggers the "extraordinary safeguard" of the *Miranda* doctrine. In the case of Wilson v. Henderson, 584 F.2d 1185 (C.A.2, 1978) involving a jail cell informant and a defendant who sought to suppress his admissions under a Sixth Amendment challenge, the court said:

> Furthermore, the admission of an in-custody statement voluntarily made to an informant seems less egregious than the use of a statement intercepted by an electronic eavesdropping device as was upheld in United States v. Hearst [563 F.2d 1331 (C.A.9, 1977), cert. den. 435 U.S. 1000 (1978)]. When a defendant makes a completely unsolicited, incriminating remark in a face-to-face encounter with an informant, he knowingly assumes the risk that his confidant may ultimately prove to be untrustworthy. In an illegal search and seizure case the Supreme Court stated: "[n]either this Court

---

612 (Pa. 1968), incriminating statements by the suspect, who was in custody in a hospital, were made to the suspect's parents (and intended victims of shooting) in the presence of participating, orchestrating police officers. Commonwealth v. Mahnke, 335 N.E.2d 660 (Mass. 1975), *cert. denied,* 425 U.S. 959 (1976), actually validated the admissibility of incriminating admissions secured forcefully by a vigilante group who acted without the involvement of law enforcement authorities. Only the case of State v. Fuller, 281 N.W.2d 749 (Neb. 1979), apparently supports the position taken by the majority in the instant case. This case was decided without benefit of written analysis other than that supplied in cogent detail by the dissenting justice. The dissent in *Fuller* noted that *no cases* had been cited by the majority "in which the *Miranda* rule has been applied to information given by informants." I suggest that the so-called "prevailing view" ascribed by the majority to their position is simply unsupported by case authorities.

nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." [Citing Hoffa v. United States, 385 U.S. 293, 302 (1966)]. Nor can such a shield be found in the Sixth Amendment.

Even if credibility were to be accorded to Joshua's testimony and we were to view Holyfield's admissions as being solicited by Jacobs, this would not be relevant. As noted previously, the United States Supreme Court denied certiorari in the case of State v. McDonald, *supra,* where the informant sought information from the suspect but did so as one who was not a figure of authority in a jail cell that was free of intimidation. That is precisely the case here. Having no awareness of Jacobs' role as an informant, and having no obligation to even speak to Jacobs, it is irrefutably clear that Holyfield, twice convicted for previous robberies, felt no pressure or degree of compulsion to reveal anything to Jacobs.

The element of compulsion is the *sine qua non* of unlawful self-incrimination addressed by *Miranda* and the federal and Nevada Constitutions. It should so remain. Since no aspect of coercion was involved in Holyfield's inculpatory remarks to Jacobs I am unable to subscribe to the majority's reversal of Holyfield's conviction. I accordingly dissent from that ruling. I do, however, concur in the affirmance of appellant Townsell's conviction.